**CONCRETE EQUIPMENT COMPANY,**
Plaintiff,

v.

**WILLIAM A. SMITH CONTRACTING CO., INC., et al., Defendants.**

No. 70–C–132.

United States District Court,
E. D. Wisconsin.

May 10, 1973.

---

Quarles, Herriott, Clemons, Teschner & Noelke by James Urdan, Milwaukee, Wis., for plaintiff.

Kluwin, Dunphy, Hankin & Hayes by Gerald T. Hayes, Milwaukee, Wis., for defendants.

## DECISION

MYRON L. GORDON, District Judge.

This lawsuit arises out of the sale of a concrete pump manufactured by the plaintiff. The pump in question, together with appurtenant equipment, repair and replacement parts was purchased by the defendants during June, 1969, for a total price of $47,499.00. A $10,000 payment toward the purchase price was made by the defendants at this time. The pump was intended for use in the construction of the Divide Tunnel and delivered to the jobsite near Leadville, Colorado.

The defendants have refused to pay the remaining balance of the purchase price of the pump due to its alleged inadequate performance in the tunnel lining operation which necessitated substantial repair grouting. The plaintiff seeks to recover the balance of the purchase price together with interest; the defendants have counterclaimed for cost of the repair grouting. For the reasons which follow, I have resolved the issues in favor of the plaintiff.

The Divide Tunnel was to be constructed as a water diversion tunnel across the Continental Divide as part of the Frying-pan-Arkansas project of the Bureau of Reclamation, Department of the Interior. This 5.3 mile tunnel was to be generally orientated in an east-west direction with the tunnel lining operation starting at the west end and progressing east. The defendants are experienced in tunnel lining operations and were the subcontractors for this tunnel.

The tunnel lining operation of the Divide Tunnel consisted of mixing the concrete at a batch plant located outside the east entrance of the tunnel, transporting the concrete mix via Moran cars to the holding car and then into the hopper of the concrete pump where it is pumped under pressure to the forms. The invert or floor of the tunnel was poured first, followed by the sidewalls and then the arch or ceiling. The concrete pump in question was used to pump concrete to the invert and sidewall forms as well as to the arch. The pouring of the invert and sidewalls was accomplished without substantial difficulty; however, voids were encountered in the arch.

The central issues of this dispute are: (1) whether the plaintiff gave the defendants an implied warranty that the pump was suitable for the lining operation of the Divide Tunnel; (2) if any warranty was made, whether such warranty was broken; and (3) whether the defendants' "notice of revocation of acceptance" was untimely and, if not, whether such notice was waived by the resumption of use of the pump. The defendants concede that they are liable for the remainder of the purchase price plus interest unless they establish that

such a warranty was made, relied upon, and broken.

### I. *Implied Warranty of Fitness*

Wis.Stats. § 402.315 (1963) provides: "Where the seller at the time of contracting has reason to know any particular purpose of which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under s. 402.316 an implied warranty that the goods shall be fit for such purpose."

The plaintiff was aware that the concrete pump purchased by the defendant was intended for use in the Divide Tunnel. However, the plaintiff asserts that the defendant relied upon his own skill and judgment to select the particular pump in question; the latter contention has been established.

The evidence adduced at trial demonstrated that the defendants were experienced in tunnel lining operations and that the selection of a suitable concrete pump occurred over a period in excess of one year. In connection with the selection of a concrete pump, the defendants sent a supervisory employee, Harold Dumas, to Milwaukee to view an on-the-job demonstration of the plaintiff's concrete pump. In addition, B. C. McGinnis, a civil engineer, supervised the search for and purchase of the concrete pump. Both Mr. Dumas and Mr. McGinnis had previously examined concrete pumps made by other manufacturers and were skilled in concrete placing operations. I find that the defendants relied upon their own skill and judgment in the selection of the concrete pump to be used in the Divide Tunnel.

### II. *Express Warranty of Fitness*

The plaintiff asserts that it warranted the concrete pump here in question as being capable of delivering concrete to the forms under pressure. On the other hand, the defendants claim that the plaintiff warranted that the concrete pump would pack the arch of the tunnel.

Prior to the acceptance of the defendants' order for the concrete pump, Eugene L. Sherrod wrote a letter to Mr. McGinnis dated June 7, 1969 (plaintiff's exhibit #2) in which he expressed his misgivings about the concrete operation of the Divide Tunnel. The principal thrust of Mr. Sherrod's doubts was that concrete quality control must be jealously maintained if pressure pumping were to be successful; the size of the aggregate and the amount of the slump or mobility of the concrete vary with respect to the area to be filled.

Although the defendants used proper ingredients in the concrete mix, there were problems encountered with control over the concrete slump. The concrete was mixed at the batch plant outside the east entrance of the tunnel and transported to the concrete pump by means of Moran cars. The Moran cars were run on a single railroad track which necessitated delays as loaded cars were required to wait until earlier cars had been emptied and moved away from the concrete pump. This delay had a profound effect upon the concrete slump since the mobility of the concrete decreased with age.

This condition was further aggravated by the lack of communication between the workmen at the pouring site and the workmen at the batch plant. Any changes made in the concrete mix were not realized until those mixtures previously loaded and en route to the pouring site were discharged.

There was evidence that the use of an air slugger in connection with the concrete pump would have minimized any stowage of concrete which may have formed at the end of the discharge pipe. Indeed, this was the recommendation of Mr. Sherrod in his letter of June 7, 1969 wherein he indicated that air would be needed to clear the end of this discharge

pipe if it were buried in concrete that had been pumped into a small area. The major drawback to the use of an air slugger is that it tends to separate the aggregate from the cement. An air slugger may achieve satisfactory results if used in connection with a concrete pump; the defendants chose not to employ this combination.

■ I find that the plaintiff warranted the concrete pump as capable of delivering concrete to the forms under pressure and that the pump performed as warranted. I further find that the defendants have not established by a preponderance of the evidence that the voids were caused by inadequate performance of the instant concrete pump.

### III.  *Waiver of Notice of Revocation of Acceptance*

■ The defendants notified the plaintiff by letter of January 28, 1970 that the concrete pump was not a suitable piece of equipment and that it would return the pump to the plaintiff. The plaintiff refused to accept the return of the pump on any terms. On June 3, 1970, the defendants resumed use of the pump at the job site and operated the pump from then until August 31, 1970, pouring approximately 8,592 cubic yards of concrete in this period.

Without resolving the issue as to whether the notice of revocation of acceptance was timely, I believe that the defendants are barred from recovery in view of its resumed use of the pump. Wis.Stats. § 402.602(2)(a).

Accordingly, the plaintiff is entitled to recover the balance of the purchase price together with interest and the costs of this action; the defendants' counterclaim is to be dismissed on its merits. Counsel for the plaintiff is requested to prepare findings of fact and conclusions of law consistent with this decision and to file them with the court after having first submitted them to defendants' counsel for comment.