**WISCONSIN ELECTRIC POWER COMPANY, a Wisconsin Corporation, Plaintiff,**

v.

**ZALLEA BROTHERS, INC., a Delaware Corporation, Defendant.**

**Civ. A. No. 73–C–222.**

United States District Court, E. D. Wisconsin.

Feb. 6, 1978.

Gilbert W. Church, Richard H. Porter, Milwaukee, Wis., for defendant; Foley & Lardner, Milwaukee, Wis., of counsel.

Jack R. Wiedabach, William P. Croke and Rocke A. Calvelli, Milwaukee, Wis., for plaintiff; Prosser, Wiedabach & Quale, Milwaukee, Wis., of counsel.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

The plaintiff in this case, the Wisconsin Electric Power Company (hereinafter "WEPCO"), has sued the defendant Zallea Brothers, Inc. (hereinafter "Zallea") for monetary damages allegedly suffered by the plaintiff due to the failure of certain products purchased from the defendant. Jurisdiction is predicated upon the diversity of citizenship of the parties. 28 U.S.C. § 1332. Trial was held before the Court, and the Court finds for the defendant Zallea on all claims presented in this case.

## DISCUSSION

### I. *Background*

WEPCO is a public utility that generates electricity and furnishes steam through underground tunnels for heating buildings in the downtown area of the City of Milwaukee. One of WEPCO's needs in maintaining its steam system is for devices attached between steam pipes to absorb axial or lengthwise movement as the pipes expand or contract with the flow of the steam. Several types of such devices exist, referred to generally as expansion joints.

Zallea is a manufacturer of a type of expansion joint, knows as a bellows joint, which contains corrugated metal walls that absorb pipe movement by flexing back and forth as the attached steam pipes expand or contract. Other types of expansion joints exist which do not involve the feature of flexible metal corrugations.

In 1967, WEPCO contacted Zallea to request that Zallea submit a bid for furnishing a large number of expansion joints needed by WEPCO for installation in a 30-inch diameter steam line. The bid was to be furnished in light of specifications furnished by WEPCO regarding the desired expansion joints. Zallea recommended that a type of metal alloy known as "Monel" be used, and submitted a bid based on furnishing bellows-type expansion joints, and after some changes were made by WEPCO in the specifications, Zallea received the job of

supplying the joints for WEPCO. The joints were manufactured by Zallea, shipped to Wisconsin, and properly installed by WEPCO in WEPCO's steam system by the end of the year 1968.

During the period of January 15, 1970 to July 27, 1971, seven failures occurred in the bellows joints in the form of steam leaks in the bellows walls. Attempts were made without success by Zallea and WEPCO to discover and correct the nature of the problem with the joints. On December 24, 1970, after the first four failures had occurred, WEPCO received authorization from the Wisconsin Public Service Commission to remove and replace all the Zallea bellows joints in the steam system. A more reliable type of expansion joint, known as a slip joint, was installed in place of the bellows joints.

The seven failures all occurred as the result of a destructive process known as stress corrosion cracking. Stress corrosion cracking is a phenomenon whereby metal that is in a stressed condition is attacked by a corrosive agent that eventually causes a crack to be forced through the entire thickness of the metal. Such corrosion is a faster process than that which occurs in unstressed metal. In the case of the Zallea bellows joints, the stress arose from two sources, a type of inherent stress known as residual stress, and an operational stress that was imposed on the bellows metal as pressure was exerted on the walls by the expanding or contracting steam pipes. The corrosive agent, whatever it was, came from the steam passing through the bellows joints.

Based on these occurrences, WEPCO is suing Zallea on several different legal theories to recover approximately $800,000 as the cost of purchase and installation of the more reliable slip joints that were substituted for the Zallea bellows joints, as well as several other items of expense. Each of WEPCO's theories will be addressed in turn.

## II. *Breach of Contract*

The first claim by the plaintiff is an assertion of entitlement to damages under the contract for the purchase and sale of the bellows joints. According to WEPCO, Zallea failed to live up to express warranties and implied warranties of fitness for a particular purpose. The Court has determined that these claims are not meritorious.

### A. *The Terms of the Contract*

Initially, the problem is to determine what documents constitute the contract between WEPCO and Zallea and what is the meaning of the terms contained in those documents. No single document can be seized upon as embodying the entire bargain between the parties; rather, as is common in commercial transactions, the terms of the agreement must be culled from a number of letters and forms generated by the parties.

The Court has determined that there were in fact two contracts, one covering sales in 1967 and the other covering sales in 1969, although the fact that there were two contracts is of little significance. The 1967 contract consisted of the following documents: trial Exhibit 3, Zallea's April 26, 1967, letter containing its price quotations for the bellows; Exhibit 6, Zallea's May 23, 1967, letter supplementing and partially superseding its April 26, 1967, letter; Exhibit 5, Zallea's letter of May 18, 1967, stating additional terms for its price quotations on the bellows; and Exhibit 227, WEPCO's June 25, 1967, purchase order. In addition, there were five modifications of the 1967 contract, agreed to by the parties, contained in Exhibits 243, 244, 245, 246, and 247, each of which is a modification evidenced by a Zallea form used for acknowledging orders for the purchase of goods. The 1969 contract consisted of Exhibits 9 and 10, letters from Zallea's sales representative containing a requested bid, and Exhibit 228, an April 28, 1969, WEPCO purchase order.

The Court is of the opinion that the terms of both the 1967 and the 1969 contracts were substantially the same, even though the contracts were formed on different types of documents. Therefore, the following discussion will refer only to the terms

of the original contract, the 1967 agreement.

■ Analysis of these documents shows that Exhibits 3 and 6, Zallea's price quotation letters, were the offers forming the basis of the 1967 contract—offers to sell a definite number of bellows manufactured to meet specifications at a definite price. The detail contained in the price quotation letters and Zallea's May 18, 1967, letter, Exhibit 5, referring to the terms of those letters as being "firm for acceptance," indicate that those letters were more than just preliminary negotiations and actually were intended as an offer. WEPCO's June 15, 1967, purchase order, Exhibit 227, was the acceptance of that offer, even though the printed terms of that purchase order purport to call for yet a further acceptance by Zallea of the purchase order. The purchase order constitutes the acceptance because it indicates WEPCO's assent to the terms proposed by Zallea for the purchase and sale of expansion joints and contains all the detail necessary to constitute an acceptance resulting in a binding contract. Therefore, with the issuance of the WEPCO purchase order, a binding contract was formed. To understand the warranty provisions of this contract, a more detailed examination of those documents is necessary.

Zallea's price quotation letters, Exhibits 3 and 6 (the offer), contain no item designated as an express warranty, but Exhibit 3 does contain the statement: "We strongly recommend that Monel Bellows be utilized should chlorides be present in the steam." This statement is claimed by WEPCO to amount to an implied warranty of fitness of the bellows for a particular purpose, the purpose of resisting corrosion. In addition, in Exhibit 5, a Zallea letter to WEPCO prior to WEPCO's acceptance of Zallea's price quotations, Zallea said: "Please note that should the expansion joints be installed per our application recommendations, Zallea Brothers, Inc., would guarantee the operation of the application as well as the recommended expansion joints." WEPCO claims that this statement amounts to an express guarantee that the bellows would work sat-

isfactorily in WEPCO's steam system. Also, the WEPCO purchase order as the acceptance contained an additional warranty that "The Seller [Zallea] warrants that all articles covered by this order will be in strict accordance with the specifications and drawings or other descriptions furnished by the Buyer and free from defects in materials and workmanship." (Exhibit 227) WEPCO claims that Zallea is also liable under this languäge because the bellows were defective in several respects and did not meet the specifications. Each of these contract claims will now be addressed in turn.

**B.** *Implied Warranty of Fitness for a Particular Purpose*

■ With regard to the claim that Zallea gave an implied warranty of fitness for a particular purpose, resistance to corrosion, WEPCO has failed to establish that any such warranty was given. According to § 402.315 of the Wisconsin Statutes (1975), an implied warranty of fitness for a particular purpose arises only where the seller has reason to know of a particular purpose for which the product is required and that the buyer is relying on the seller to furnish suitable goods. Neither Zallea's recommendation that the bellows be made from Monel metal rather than stainless steel nor any other evidence in this case establishes that this warranty was created. While Zallea was generally aware, as a bellows joint manufacturer, that joints should not be susceptible to corrosion, the record does not indicate that Zallea knew that a strong resistance to corrosion was a particular purpose for which the bellows joints were required. Moreover, no information was communicated by WEPCO to Zallea and no special circumstances existed to inform Zallea that WEPCO was relying on Zallea to choose a corrosion resistant material. In fact, WEPCO did undertake a significant analysis on its own, as shown by the recommendations of various WEPCO officials that bellows joints should not be purchased, to study problems associated with stress corrosion cracking in its steam system. See also plaintiff's trial brief at page 5. The simple fact is that WEPCO did not commu-

nicate to Zallea that WEPCO was relying on Zallea to choose a metal that would satisfy WEPCO's particular needs or purposes, and a showing of reliance on a seller to select a correct product for the buyer is a prerequisite to recovery on a theory of implied warranty of fitness for a particular purpose. *Valiga v. National Food Co.,* 58 Wis.2d 232, 206 N.W.2d 377 (1973). The Court also notes that WEPCO has not established that there was a breach of the implied warranty of merchantability created by § 402.314, Wis.Stats. (1975). The bellows satisfied all the quality standards of § 402.314(2)(a)–(f).

## C. *Express Warranty*

### (1) *The Letter of May 18, 1967—Exhibit 5*

■ Liability under the contract is also claimed by WEPCO to arise under the Zallea letter of May 18, 1967, to WEPCO, Exhibit 5, in which Zallea promised to "guarantee the operation of the application as well as the recommended expansion joints." This language became a part of the contract because the letter was sent for the explicit purposes of reaffirming the existing Zallea offer and altering certain terms of the offer. However, even though included in the contract terms, this guarantee is not so sweeping, as is in effect contended by WEPCO, that Zallea was assuming the obligations of an insurer of the bellows joints as used in WEPCO's steam system. As used in the context of the letter, the guarantee of the "operation of the application" of the joints was not a flat guarantee that each joint would work; rather, it was a guarantee that the application scheme for the placement of joints recommended by Zallea would be adequate to absorb the expansions and contractions of the steam pipes. That letter's guarantee of the bellows joints themselves must likewise be given the proper scope by not interpreting it as rendering Zallea liable as an insurer against all possible problems.

This language is also insufficient by itself as a basis for holding Zallea liable for the reason that there are no standards specified against which Zallea's performance could be measured, and there is but little evidence to indicate that the parties understood the language to render Zallea absolutely liable. Testimony given by officials of both parties indicates that they interpreted the contract's warranty terms as being limited, not absolute, which is evidence of the intent of the parties at the time the contract was agreed upon. Thus, to evaluate Zallea's performance under this guarantee, the Court is forced to turn to some source of standards, such as the terms of the warranties specified in both Zallea's and WEPCO's printed forms, which are substantially similar to each other. The Court does not believe that by this letter of May 18, 1967, Zallea intended to assume responsibility for all failures that might occur, no matter what the causes, and since no other standards are available to apply to this guarantee, the Court interprets the broad guarantee in this letter as covering the same concerns, freedom from defects, and compliance with specifications, drawings, and descriptions as the standard terms of the printed forms used by both WEPCO and Zallea covered.

### (2) *The WEPCO Purchase Order Warranty—Exhibit 227*

■ These standard terms are the last basis for contractual liability asserted by WEPCO against Zallea. The terms provided that the seller warrants the bellows to be in compliance with all specifications and to be free of defects in workmanship and materials, and the terms became a part of the contracts by being included in WEPCO's purchase order, the contract's acceptance, Exhibit 227. Such warranty terms contained in an acceptance become part of the contract where, as here, the offer was not expressly limited to the terms of the offer, the terms do not materially alter the offer, and the offeror fails to give notice of objecting to the terms. § 402.207, Wis.Stats. (1975).

WEPCO's claim in this regard is that Zallea breached the warranty of freedom from the defects by selling bellows that

were defectively designed. Zallea could not have breached any warranty of compliance with specifications for the reason that no specifications were furnished by WEPCO as to required longevity of service in the steam lines or as to required resistance to corrosion, and the evidence shows that none of the other specifications was breached. What WEPCO does argue is that the bellows joints were defectively designed in three respects: first, Zallea failed to submit the joints to an annealing process; second, Zallea used a liner inside the joints which allegedly facilitated corrosion by increasing condensation; and third, Zallea failed to use a thicker metal. These claims are the same allegations upon which WEPCO relies to support its strict liability in tort theory, and at this point the contract and tort claims tend to merge. The question of whether or not the bellows joints were defective will now be addressed.

(a) *Failure to Anneal As a Design Defect*

The first design defect asserted by WEPCO is that Zallea failed to anneal the bellows joints. Annealing is a process whereby metal is heated to a certain temperature for a certain length of time for the purpose of reducing residual stress in the metal. The bellows joints manufactured by Zallea were formed by a process whereby previously annealed Monel metal was forced into the desired shape without being heated. This process of hydraulic formation is known as coldworking. Coldworking introduces residual stresses into the metal that remain unless further annealing is performed to remove the stresses. In addition to the residual stresses introduced by the coldworking process, the bellows joints were subjected to high operational stresses caused by virtue of the fact that the bellows joints necessarily were designed to operate above the yield point of the metal, that is, at the point where the metal would be permanently or plasticly deformed. Such stresses can be factors in causing stress corrosion cracking. WEPCO's claim is that Zallea's failure to anneal the bellows joints caused them to have a greater sus-

ceptibility to stress corrosion cracking than they would have had in an annealed state.

Both WEPCO's and Zallea's experts agreed that annealing the bellows joints would have decreased the joints' susceptibility to stress corrosion cracking. However, there was substantial disagreement over how much benefit annealing would have contributed. Dr. Weiss and Mr. Foley testified for WEPCO that annealing would have eliminated the residual stress and thus would have enabled the joints to last the lifetime of the steam system. They also stated that the failure to anneal was a design defect. Their conclusions were generally supported by two industry publications. Technical Bulletin T–5 entitled "Engineering Properties of Monel" (Exhibit 96), published by a manufacturer of Monel, stated at page 11: "Equipment for use in environments where cracking may occur should be heat treated after fabrication to remove all stresses set up by forming and welding * * *." A report published by the Consolidated Edison Company of New York (Exhibit 82) stated at page 59 that "it has been proven that annealing is effective in retarding stress-corrosion cracking." However, Dr. Leonard, Dr. Loper, and Mr. Wolpert testified for Zallea that annealing would have reduced the susceptibility of the joints to stress corrosion cracking only marginally. According to Zallea's witnesses, the operational stresses imposed on the joints through expansions and contractions within WEPCO's steam system were so great as nearly to overcome completely the beneficial results of annealing. Annealing would have done nothing to offset the presence of such high operational stresses, and this conclusion is supported by both of the above-mentioned reports. Technical Bulletin T–5 states at page 59 that in addition to heat treatment, "operating stresses should be kept to a minimum." The Consolidated Edison report notes that annealed Monel bellows joints have been known to fail and that annealing is likely to result in a relatively small extension of average service life.

Moreover, Mr. Wolpert testified that the custom in the industry is for joint manufacturers not to anneal unless specifically requested to do so by a purchaser. It is undisputed that WEPCO did not request that the joints be annealed. Wolpert further testified that annealing creates other problems, such as reduced fatigue life in metal which is an important design consideration even for a steam system that undergoes only a few complete cold to hot to cold cycles per year. The Court further notes that WEPCO's experts generally were speaking of a "full anneal" when discussing the benefits to be derived from annealing, whereas Mr. Wolpert testified that a fully annealed bellows would be unworkable and that no purchaser requests full annealing.

A question was also raised as to the extent to which joints would be recoldworked by the process of expansion and contraction within the steam system, a process which would once again introduce residual stresses into the bellows joints metal. The conclusion of another industry publication, the Standards of the Expansion Joint Manufacturers Association, Inc. (3d ed. 1969) (Exhibit 76) was in accord: "Expansion Joint Bellows are invariably used at movements producing high stresses, frequently within the plastic range; thus any beneficial effect of removing residual stresses would be quickly nullified by operating stresses. The possible occurrence of stress corrosion in stainless steel bellows cannot be eliminated by heat treatment or by reducing the movement to a low order." *Id.* at 47.

The degree of controversy among the witnesses as to the beneficial effects of annealing has convinced the Court that significant doubt exists as to whether or not annealing would have prevented the joint failures at issue here. Therefore, the Court cannot find that the failure to anneal the joints was a design defect. The uncontroverted custom of the industry was not to anneal unless annealing was requested by the purchaser, and such a custom is an important consideration in determining whether or not a defect existed within the meaning of the contract between the par-

ties. The evidence also established that engineers employed by WEPCO recommended against the use of bellows joints from any manufacturer for the reason that bellows joints were known to be susceptible to stress corrosion cracking. This knowledge by WEPCO tends to indicate that stress corrosion was anticipated and that, therefore, the failure to anneal was not a defect.

In addition to arguing that failure to anneal was not a defect, Zallea has asserted as an affirmative defense that the predominant cause of the bellows joint failures was the presence of excessive amounts of corrosive substances in WEPCO's steam. Zallea introduced substantial testimony and exhibits tending to show that WEPCO's steam was contaminated with various substances, including sulfur, sodium hydroxide, and sulfur dioxide. Unidentified chemical deposits were found on the surface of some of the failed bellows; the insides of the pipes and joints were said to be covered with a layer of a white substance, identified by Zallea's expert Mr. Rice as an indication that problems existed in WEPCO's boiler water treatment practices; and a large quantity of an unknown deposit was found just upstream from the location of the first failure. In addition, Exhibit 197 indicates that all seven failures occurred at points relatively close to the steam generating plant where the concentration of contaminants would be expected to be the greatest.

Both parties were agreed that some corrosive element was present in the steam, for stress corrosion cracking, the cause of these failures, could not have taken place without a corrosive element. The problem with determining whether or not the steam contained excessive amounts of corrosive substances is that the experts testified that no standards exist specifying what constitutes acceptable or unacceptable steam quality. There also are no clear standards to apply in evaluating the propriety of practices relating to chemical treatment of boiler water from which the steam is generated. As the result of this lack of governing standards, the Court is unable to determine

either that the level of corrodants was excessively high or that WEPCO's steam was of an acceptable quality.

However, the Court is able to find that one or more contaminants were present in WEPCO's steam and caused corrosion in the bellows joints. The weight of the evidence does indicate that some compound of sulfur was the most likely corrosive agent. Zallea's expert, Dr. Rice, testified as to several means by which sulfur could have found its way into WEPCO's steam, and it was sulfur that was found at the tips of cracks in the joints where the active corrosive agent would be expected to be found. In addition, several of the expert witnesses indicated their belief that sulfur was the active corrodant.

However, the lack of applicable standards of steam quality precludes the Court from finding that the sulfur was present in excessive quantities or that the sulfur contributed relatively more to the stress corrosion cracking than did the stress placed on the joints. Rather, the view of the Court is that neither party contracted with regard to the possibility of sulfur corrosion. Since Zallea made no representations that its joints would withstand sulfur corrosion, and since the parties did not contract with regard to the possibility of such corrosion, the Court believes that the risk of such an unexpected event rested upon WEPCO as the purchaser of the joints and the party responsible for steam generation. While sound business practices may dictate that Zallea should have sampled and analyzed WEPCO's steam before selling the joints, the common rule that, absent representations by the seller, the buyer determines the suitability of a product for his own use still applies. See *Concrete Equipment Co. v. William A. Smith Contract Co., Inc.,* 358 F.Supp. 1137 (E.D.Wis.1973). According to this view, whether or not WEPCO's steam was "normal" for steam produced by WEPCO's generating plant is irrelevant.

The Court's conclusion from this discussion of steam quality and corrosive agents is that while the quality of WEPCO's steam cannot be characterized as good or bad, neither can Zallea be held liable for not having foreseen the presence of corrodants in WEPCO's steam.

(b) *The Design of the Bellows Joint Liners As a Defect*

The second design defect asserted by WEPCO is that the joints contained a liner, a cylindrical tube of metal, on the inside of the bellows and that steam was able to flow underneath the liner and condense on the bellows walls which had the effect of depositing corrodants on the bellows walls. The liners were utilized in the design of the joints to keep the steam flowing smoothly through the joints. Each liner was welded to the joint around one edge, with the other edge being open to allow for expansion as the liners were heated. Each liner also contained some holes, which were later changed in the design to slots, to allow steam to move more freely between the bellows and the liner and thus to prevent formation of condensation.

The experts disagreed as to whether or not the liner design contributed to the failures of the bellows. WEPCO's expert, Mr. Foley, testified that the liner metal expanded and contracted at a different rate than did the metal of the steam pipes adjoining the bellows joints. This different rate of expansion and contraction supposedly caused the edge of the liners to fall below the edge of the adjoining steam pipes so that the edge of the pipes exerted a pressure on the liners, causing the liners to buckle. The buckling left a gap through which steam could enter into the space between the liners and the bellows walls, which allegedly caused greater condensation on the bellows walls themselves.

The Court does not believe that this testimony of Mr. Foley is entitled to significant weight. Mr. Foley admitted that he had little expertise in the area of bellows joint design. In addition, WEPCO's other expert witness, Dr. Weiss, was only able to say that he "suspected" the liners may have contributed to the failures of the bellows joints. In contradistinction to this testimo-

ny, Mr. Wolpert, who was familiar with the field of bellows design, testified that the liners did not contribute to the failures of the joints, and his testimony was supported by that of Dr. Loper and Dr. Leonard, Zallea's other experts. Moreover, Dr. Leonard indicated that the cracking of the joints tended to appear in the upper portions of the bellows walls, which would not be expected if a significant amount of condensation were forming and flowing down the sides of the bellows walls. The Court accepts the testimony of Zallea's witnesses on this point and therefore concludes that the design of the liners was not a defect that contributed to the failures of the joints.

#### (c) *The Thickness of the Bellows Walls As a Defect*

The final defect alleged by WEPCO is that the bellows should have been designed to include thicker bellows walls. The evidence indicates that none of the failures occurred in joints having thicker walls, and WEPCO's experts indicated that a thicker-walled bellows would be less susceptible to stress corrosion cracking. But the testimony of Mr. Wolpert, who has had greater experience in the design of bellows, indicates that the use of thicker walls would tend to reduce the fatigue life of the bellows, and he believed that resistance to fatigue failure was an important and necessary feature of the bellows design. Moreover, WEPCO did not request that the bellows walls be made to any specific thickness, and there is no evidence whatsoever that the thickness used by Zallea in its bellows design was not within appropriate tolerance for the expansion joint industry. For these reasons, the Court also concludes that the failure to use a thicker metal was not a defect in Zallea's design.

In light of the foregoing discussion of the contractual warranty terms, the Court has determined that Zallea did not breach the contract by failing to live up to the terms of the warranty. The next issue is WEPCO's allegation that Zallea is strictly liable in tort for the bellows joint failures.

### III. *Strict Liability in Tort*

■ WEPCO's claim that Zallea is strictly liable in tort requires proof by WEPCO that there was a defect in the bellows joints which rendered them unreasonably dangerous. The short answer to this strict liability claim is that, as demonstrated above, WEPCO has failed to carry the burden of showing that the joints were defective in design in any of the asserted respects. The expert testimony was in such conflict that this Court is unable to conclude that the failure to anneal, the design of the bellows liners, or the thickness of the bellows walls amounted to defects for which strict liability may be imposed.

■ However, there is in addition one other fatal weakness in WEPCO's strict liability theory. That weakness is that WEPCO officials had knowledge of stress corrosion cracking problems associated with bellows joints, yet elected to purchase the bellows joints despite such knowledge. Testimony by both Carl Thiele and Sol Burstein, officials of WEPCO, indicated their awareness of the possibility that stress corrosion cracking could occur. Thiele had, in fact, recommended against the purchase of bellows joints because he believed that another type of expansion joint was more reliable, but Thiele's recommendation was overridden, primarily for the reason that the other type of expansion joint was more expensive to install and maintain. Having opted for the alternative known to be less reliable due to the possibility that stress corrosion cracking may occur, WEPCO assumed the risk of the failure of the joints within its system. See *Vincer v. Esther Williams All-Aluminum Swimming Pool Co.*, 69 Wis.2d 326, 230 N.W.2d 794 (1975).

### IV. *Negligence*

WEPCO's fourth claim is that Zallea was negligent in three respects: first, in failing to exert greater effort to correct the problem once the joints began failing; second, in discarding some of the failed bellows sent by WEPCO to Zallea for analysis; and third, in designing and manufacturing the bellows joints. None of these allegations of negligence is meritorious.

■ WEPCO's first argument is that Zallea promised to conduct an investigation for the purpose of discovering and correcting whatever problems existed in the joints but then simply failed to live up to that promise. The evidence does indicate, however, that Zallea had studies performed by the Huntington Alloys Products Division of the International Nickel Company, a Monel manufacturer, and by the Pittsburg Testing Laboratory, and that Zallea made several suggestions to WEPCO, such as installing bellows with a double-walled construction as a means for correcting the problems. Zallea also cooperated with WEPCO in the process of replacing the failed joints. WEPCO has failed to adequately show that Zallea could have or should have done more to correct the problems. WEPCO's unsupported claim that Zallea was leading it down a "merry path" rather than earnestly trying to correct the situation does not support a finding of negligence on Zallea's part. Moreover, even if Zallea were found negligent on this basis, WEPCO has not shown in any fashion how such negligence caused or contributed to WEPCO's losses.

As to the next claim of negligence, Zallea's destruction of certain of the failed bellows, the evidence does indicate that Zallea did discard some of the bellows joints with little or no testing. But once again, just how this amounts to negligent action sufficient to support a claim for the damages suffered by WEPCO as a result of the bellows joint failures is not clear. The complexities and contradictions in the testimony and evidence introduced at trial in this case indicate that additional studies performed on the discarded bellows would not likely have contributed much toward solving the problems of the joint failures. Again, WEPCO has not established that the discarding of the bellows caused or contributed in any way toward its losses.

■ Lastly, there is the claim that the joints were negligently designed and manufactured. The Court finds that Zallea was not negligent in the design and manufacture of the bellows joints, and since this claim of negligence was not specifically presented by WEPCO at trial, and since Zallea indicated that it had been complying with the custom of the industry, no further discussion of this claim is necessary.

## CONCLUSION

The Court finds for the defendant Zallea Brothers, Inc., on all claims asserted against it by the plaintiff Wisconsin Electric Power Company, and orders that judgment be entered by the clerk of court dismissing this action on its merits with costs. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.