[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 78 
This appeal involves an action based upon an alleged breach of contract, breach of good faith, and a claim of misrepresentation. The case was tried before a jury in the Circuit Court for Mobile County. A jury verdict and judgment in behalf of the plaintiff Kennedy Electric Company, Inc. (Kennedy) against defendants Moore-Handley, Inc. (Moore-Handley) and Westinghouse Electric Corporation (Westinghouse) for $1271.64, and a verdict and judgment for the defendants on a counterclaim against Kennedy and counterdefendant Insurance Company of North America (INA) for $64,437.00 were entered, with a resulting net judgment in favor of defendants Moore-Handley and Westinghouse and against Kennedy and INA for $63,165.36. Both Kennedy and INA have appealed.
Six issues are presented for our consideration by this appeal. They are:
 1. Did the trial court err to reversal in granting Westinghouse a directed verdict on the fourth cause of action of fraud?
 2. Did the trial court err in excluding Kennedy's evidence as to extended overhead, additional expense or other delay damage, and estimated costs of repair or replacement of certain items?
 3. Did the trial court err in granting the defendant's motion to dismiss the second cause of action (based on breach of a good faith obligation)?
 4. Did the trial court err in excluding plaintiff's exhibit No. 9, consisting of a schedule of projected contract completion dates prepared by Kennedy's superintendent?
 5. Did the trial court err in instructing the jury to disregard any evidence which might have gone to the interpretation of the contract?
 6. Did the trial court err in excluding proposed testimony of a witness as to personal knowledge of malfunction of circuit breakers involved in the litigation?
We answer the questions posed by these issues in the negative, and we affirm the judgment of the trial court.
Kennedy's original complaint stated three causes of action. The first was for a breach of contract to supply certain electrical equipment, the second sought punitive damages for breach of an alleged duty to act in good faith, and the third cause was specifically for breach of contract for failure to provide a "VAR" meter. Subsequently, the complaint was amended to add two new causes of action. The fourth cause was against both defendants for fraud. The fifth cause was against both defendants for failure to install certain "bus bars" under the contract. On defendants' motion, the trial court dismissed the second cause. The defendants then answered the final complaint with various defenses and a counterclaim alleging that a portion of their bill remained unpaid, and on motion were allowed by the trial court to add INA as a counterdefendant under its payment bond. The fourth cause of action was ultimately amended to eliminate Moore-Handley as a defendant in that cause. At the close of the case, the defendant Westinghouse was granted a directed verdict as to the fraud count in cause number four. Causes of action one, three, and five were considered by the jury.
The suit arose from the following facts:
In 1976 the Alabama State Docks Department (Docks) employed Owen S. Posey and Associates (Posey) to design a new 23-kilovolt electrical distribution system for the Docks property in Mobile. Initially the system was designed so that it did not include any isolation switches in series with the air circuit breakers at the substations. An isolation switch was defined by the National Electric Code as "a switch intended for isolating an electrical circuit from the source of power," and the Code added, "It *Page 79 
has no interrupting rating, and it is intended to be operated only after the circuit has been opened by some other means." The isolation switches were considered by Posey to be unnecessary. After operational personnel at the Docks complained, however, Posey changed its design to include isolation switches. The design drawings were altered at one place to show reference to a "load break" switch; at all other places on the drawings, the reference was to an isolation switch or simply "switch." The testimony revealed that the load-break switch had interrupter capabilities that the isolation switch did not have. The testimony also revealed that, at the time, different types and models of both switches were available for use. Ultimately, a set of specifications, prepared by Posey, was issued by the State Docks. The specifications referred specifically to isolation switches. The testimony of the Docks engineer revealed, however, that where the specifications required four isolation switches, the Docks had really wanted load-break type switches or load-interrupter switches.
On January 5, 1977, Kennedy executed a contract with the Docks to construct the substations. Thereafter, Kennedy obtained a quotation from defendant Moore-Handley, a distributor for Westinghouse products, to provide various electrical equipment called for by the specifications designed by Posey. Kennedy negotiated with Moore-Handley as to its price, achieved a reduction in the quoted price, and then issued a purchase order to Moore-Handley on January 18, 1977. This purchase order called for Moore-Handley to provide equipment "per the attached bill of materials," and the attached bill of materials was a complete copy of the Moore-Handley quotation. On the back of the first page of the quotation sent with the purchase order were certain provisions, printed in red, limiting Moore-Handley's liability for consequential and delay damages.
Moore-Handley ordered the Westinghouse equipment, which it had agreed to supply from Westinghouse's local sales engineer, John Cox. The testimony revealed that Cox contacted the Westinghouse engineers and ordered what he considered to be the appropriate AWP (brand) isolating switch. Subsequently, Cox was told by the engineers that another type of isolating switch would have to be used to meet the specification requirements. The type of switch ordered did not have the load-breaker, interrupter switch capabilities. Throughout this time period, Cox corresponded frequently with Kennedy and the Docks and assured them that the switches ordered would meet the specifications.
The isolation switches and certain other equipment were received in Mobile by early November, 1977, and shortly thereafter were installed on the Docks property. The "VAR METER" and the "Bus Bars," however, were not delivered at that time. In early 1978, Arnold Schwartz, an electrical engineer working for Posey, carried out an inspection of the substation equipment, which included the isolation switches. Schwartz reported that the isolation switches were not "load-break" as specified, but, were, in fact, isolation switches. Following this discovery, a series of efforts was made by Westinghouse to satisfy the Docks. Two of the isolating switches were fitted with arc chutes and flicker blades that gave them load-break capabilities. Ultimately, Posey recommended, and the Docks accepted, a proposed resolution of the problem, which required, from Westinghouse, three things: installation of two more sets of are chutes and flicker blades, certification that the modified switches were load-break and fully warranted, and complete drawings and parts lists. Cox agreed to provide what was requested.
The issues presented by the appellants are now considered separately.
 I. Directed Verdict on Fraud Cause of Action
Kennedy contends that the trial court erred to reversal by directing a verdict in favor of the defendant Westinghouse on the fourth cause of action of fraud. The basis of plaintiff's contention is that the defendant promised to supply four isolating switches as described in the plaintiff's purchase *Page 80 
order and in the Moore-Handley customer's acknowledgement sent after the order. The switches were to meet the State Docks' specifications. The specifications said:
 b. The isolating switches shall be rated at 1200 amperes continuous current and designed to withstand a momentary fault condition of 60,000 Amps at a nominal system voltage of 4160 volts. The switch shall be a Westinghouse type AWP or approved equal in a cabinet matching the circuit breaker.
The plaintiff argues that there was more than a scintilla of evidence that the agent for Westinghouse, Cox, knew that the plaintiff needed load-break interrupter switches, and, yet, delivered simple isolation switches. Generally, under the scintilla rule, the entire evidence must be viewed in a light favorable to the opponent of the motion, in this case the plaintiff, and a question must go to the jury if the evidence, or any reasonable inference arising therefrom, furnishes the smallest trace of support for the opponent's theory. GreatSouthwest Fire Insurance Co. v. Stone, 402 So.2d 899 (Ala. 1981). This is the standard that must be applied by the trial court and is the standard we must apply upon review. Turner v.Peoples Bank, 378 So.2d 706 (Ala. 1979). In judging whether a scintilla of evidence exists suggesting fraud, we must first look to see what constitutes the tort of misrepresentation in Alabama. To establish a cause of action for fraud, a plaintiff must prove that the defendant knowingly made a false representation of a material, existing fact on which the plaintiff relied to his detriment. Parker v. Thyssen MiningConstruction, Inc., 428 So.2d 615 (Ala. 1983). Woodard v.Woodard, 413 So.2d 1060 (Ala. 1982). In cases of misrepresentation of existing facts, a reckless misrepresentation might constitute fraud. The rule is different where the alleged representation relates to some future event, such as the promises which Westinghouse allegedly made. In such a situation, the law requires, in addition to the normal elements of falsity, reliance and damage, proof that, at the time the statement or promise about the future was made, there was an actual fraudulent intent not to perform the act promised and an intent to deceive the plaintiff. Birmingham BroadcastingCo. v. Bell, 259 Ala. 656, 68 So.2d 314 (1953); accord,Robinson v. Allstate Insurance Company, 399 So.2d 288 (Ala. 1981).
Kennedy relies on the fact that the Westinghouse catalog available to the public at the time the contract was made showed only an AWP interrupter switch and not the AWP-6 ordered by Cox. Plaintiff contends that because of that fact, Cox should have known that Kennedy wanted the AWP and not the newer AWP-6, even though the specifications were not clear (calling for an isolation switch-AWP and not for an AWP interrupter). We disagree. We do not see a scintilla of evidence that suggests or reasonably implies that the defendant Westinghouse, through its agent Cox, intentionally misrepresented the switches that were to be ordered and delivered. A scintilla of evidence will not be inferred by the mere speculation that Cox should have known what the plaintiff wanted. Speculation is not a proper basis for a verdict. Alabama Power Company v. Smith,409 So.2d 760 (Ala. 1981). Furthermore, there is no evidence that Kennedy was ever told by Cox that the switches would be load-break interrupter switches. Cox consistently told Kennedy that the switches would be isolating AWP-6 switches, which they ultimately were. There is not a scintilla of evidence suggesting any misrepresentation by Cox to Kennedy, and damages alone will not support an action for fraud. Parker v. ThyssenMining Construction, Inc., supra.
 II. Exclusion of Overhead and Other Damages
Kennedy contends that the trial court erred by excluding the evidence as to extended overhead, additional expenses, delay damages, and the estimated costs of repair or replacement of certain items. The basis of Kennedy's contention is that the court should not have found the limiting conditions on the back of the front page of *Page 81 
the quotation to be a part of the overall contract. The plaintiff argues that whether the conditions were part of the contract, or were unconscionable, was at least a question for the jury to decide. We disagree. The construction of a written document is a function of the court. Wheeler v. First AlabamaBank of Birmingham, 364 So.2d 1190 (Ala. 1978). We agree that the conditions, printed in red, on the back of the quotation were a part of the contract and work to limit the defendants' liability for consequential and delay damages. The important terms of the quotation are as follows:
 4. An acceptance of our quotation by order or otherwise cannot be revoked or cancelled without our consent.
 5. In no event will we be liable for any indirect, special or consequential damages.
. . . .
 8. Where date of delivery is given, we will endeavor to complete as near that date as possible, but we shall not be liable for loss caused by delay in delivery.
The sales contract between Kennedy and Moore-Handley (and later Westinghouse by assumption) is governed by the Uniform Commercial Code. The main dispute arises as to when the contract was finalized. We find that the Moore-Handley quotation constituted an offer which was accepted by the Kennedy purchase order containing the limiting conditions.Wisconsin Electric Co. v. Zallea Brothers, Inc., 443 F. Supp. 946
(E.D.Wis. 1978). Far from objecting to the terms of the quotation, the plaintiff placed its purchase order "per" the quotation, with the same quotation attached. The plaintiff argues that the purchase order was the "original" offer and that Moore-Handley's acceptance came with the customer acknowledgement form. Even assuming that the purchase order constituted the original offer, since it incorporated the quotation terms and no other terms were mentioned by Kennedy, the quotation would, again, have become a part of the contract when Moore-Handley accepted. The plaintiff further contends that the limiting conditions are unconscionable. We disagree. Alabama law clearly permits a seller to limit or exclude by contract any liability for consequential damages. Code 1975, §7-2-719. Such agreements are valid and enforceable. BurbicContracting Co., Inc. v. Cement Asbestos Products Company,409 So.2d 1 (Ala. 1982). Each party to the contract had a meaningful choice. The plaintiff had complete freedom to negotiate on equal footing with the defendant Moore-Handley on every aspect of the contract, including the limiting conditions. Therefore, we find that the trial court was correct in including in the contract, as a matter of law, the limiting conditions.
 III. Dismissal of Bad Faith Claim
The plaintiff's next contention is that the court erred to reversal by dismissing the second cause of action (based on a breach of a good faith obligation). The plaintiff argues that this court should extend to the area of general contract law the tort of bad faith that has already been recognized in the context of insurance policy cases. Prudential Insurance Co. ofAmerica v. Coleman, 428 So.2d 593 (Ala. 1983); Chavers v.National Security Fire and Casualty Co., 405 So.2d 1 (Ala. 1981). Although every contract does imply good faith and fair dealing (see § 7-1-203, Code 1975), it does not carry with it the duty imposed by law which we have found in the context of insurance cases. We are not prepared to extend the tort of bad faith beyond the area of insurance policy cases at this time. See Brown-Marx Associates, Ltd. v. Emigrant Savings Bank,527 F. Supp. 277 (N.D.Ala. 1981).
 IV. Exclusion of Exhibit No. 9; Schedule of Completion Dates
The exclusion of Exhibit No. 9, if error, was harmless error, since the same evidence was admitted at another time in another form. Jemison v. Belcher, 368 So.2d 849 (Ala. 1979). Alternatively, the exhibit was irrelevant because it was to be used to show the damages due to delay in delivery. These damages were limited by *Page 82 
the conditions of the contract and were not to be considered by the jury.
 V. Court's Instructions to the Jury
The plaintiff contends that the trial court erred when it instructed the jury not to consider any opinion evidence which interpreted the contract for them. We disagree. Expert testimony is not to be admitted unless "it is clear that the jurors themselves are not capable, from want of experience or knowledge of the subject, to draw correct conclusions from the facts proved." Louisville Nashville Railroad Co. v. Vickery,288 Ala. 555, 263 So.2d 656 (1972). Kennedy had the opportunity to, and did, present experts that were allowed to help the jury understand the contract by defining technological scientific terms. The jury was allowed to consider this testimony. It was for the jury to decide the meaning of the contract, and if the trial court excluded opinions that would have invaded the province of the jury in that regard, such action was entirely correct. See Alabama Power Co. v. Williams, 222 Ala. 75,130 So. 788 (1930).
 VI. Exclusion of Witness Testimony
Plaintiff finally contends that the trial court erred to reversal in refusing to allow its witness to rebut the testimony of defendants' witness that "the breaker and its cubicle are as idiot proof as they can be built." Plaintiff argues that its witness should have been allowed to answer the questions (1) whether he had any personal knowledge of a malfunction occurring with respect to the energizing of a circuit breaker and (2) whether he had an opinion as to any manner in which a malfunction of the circuit breakers could occur. We disagree. Plaintiff offers no argument to show that these areas of inquiry were relevant, nor does he answer the obvious defect in his argument that it was plaintiff's counsel himself who elicited the testimony that he later sought to rebut. Generally, if a witness, on cross-examination, is interrogated as to a matter wholly immaterial to any issue in the case, the party calling for such evidence is concluded by the answer and cannot impeach the witness by contradicting the answer. Clancey Lumber Co. v. Howell, 260 Ala. 243,70 So.2d 239 (1954).
For all of the foregoing reasons, we find no reversible error, and we affirm the judgment of the trial court.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES, EMBRY and BEATTY, JJ., concur.