The Winston County Hospital Board d/b/a Burdick-West Memorial Hospital ("the hospital") sued Haleyville Health Care Center; its parent company, AGE, Inc.; and its administrator, Joseph Church (collectively, "the nursing home"), for fraudulently "dumping" a nursing home resident on the hospital.[1]
Following a nonjury trial, the trial court entered a judgment in favor of the hospital, awarding it $32,086.54 in compensatory damages and $50,000 in punitive damages. The nursing home appealed to our supreme court, and the supreme court transferred the cause to this court pursuant to Ala. Code 1975, § 12-2-7(6).
On appeal, the nursing home argues (1) that the hospital did not prove its fraud claim, (2) that the hospital was not entitled to punitive damages, and (3) that the trial court improperly calculated the compensatory damages. After reviewing the record, we affirm the trial court's judgment in favor of the hospital. We also affirm the punitive damages award. However, we reverse that portion of the judgment awarding $32,086.54 in compensatory damages and remand the cause for entry of a judgment awarding compensatory damages of $18,863.04.
The hospital and the nursing home operated under an agreement whereby they consented to the transfer of patients and patient information between themselves.[2] The hospital agreed that it would accept nursing home patients for 23-hour medical evaluations, and the nursing home agreed to reaccept those patients at the end of the evaluation period if the patients did not meet the criteria for hospital admission.
The hospital alleged that the nursing home induced it to accept Mr. William Cribbs, a nursing home patient, for a 23-hour evaluation, thereby implying that the nursing home would take Mr. Cribbs back after the evaluation, when, in fact, the hospital alleged, the nursing home never intended to take Cribbs back. The hospital alleged that it suffered financial loss when the nursing home refused to reaccept Cribbs after 23 hours and it was compelled to keep Cribbs until it could make other arrangements for his care.
William Cribbs is a 65-year-old man with moderate senile dementia. Before June 25, 1992, he lived alone in his own home. After he was partially paralyzed as the result of a stroke, Cribbs was unable to care for himself, and the Lamar County Department of Human Resources (DHR) filed a petition, pursuant to Ala. Code 1975, § 38-9-5 (the Adult Protective Services Act), to arrange protective placement for Cribbs. On June 25, 1992, the Lamar Circuit Court ordered that Cribbs be placed in the nursing home.
The evidence presented at trial tended to show that Cribbs was not happy in the nursing home. He was lonely and depressed *Page 791 
because his family did not come to visit him and because he was a "black man in [an] essentially 99.9% white nursing home." The evidence also tended to show that the nursing home was not happy with Mr. Cribbs. Trial testimony established that the nursing home "did not make as much money off of" Cribbs because he was a "welfare-sponsored" patient. In addition, Mr. Cribbs had temper tantrums; he threw a plate across the dining room and kicked out an air conditioner. On July 20, 1993, he set fire to some papers in his closet, and admitted to a member of the nursing home staff, "I set the damned place on fire. I don't care if the whole damned place burns to the ground and everybody in it. I'm going home."
After the fire, officials at the nursing home contacted Mr. Cribbs's personal physician, who was on the staff at the hospital. They informed the doctor that Cribbs was homicidal and that he had set fire to his room, and they requested that Cribbs be transferred to the hospital for a mental evaluation. The doctor agreed to the transfer, and the nursing home sent Cribbs to the hospital. There he was evaluated, and his physicians determined that he did not meet continued-stay criteria. His doctors concluded that he did not require hospitalization and that he could be adequately cared for in the nursing home.
When the hospital sent Cribbs back to the nursing home via ambulance, however, nursing home officials informed the ambulance drivers that they — and Mr. Cribbs — would be arrested for trespass if they attempted to unload Mr. Cribbs. The ambulance drivers returned Cribbs to the hospital, where he remained for the next 60 days. He was eventually transferred to a state mental hospital.
 Proof of Fraud
In ordinary cases of alleged fraud, the plaintiff must prove that the defendant made a false representation of a material fact and that the plaintiff relied upon the false representation to his detriment. Harmon v. Motors Ins. Corp.,493 So.2d 1370 (Ala. 1986). However, the law places a heavier burden on a plaintiff attempting to prove fraud based on a misrepresentation relating to an event to occur in the future. In "promissory fraud" actions, the plaintiff must prove that, at the time the representation was made, the defendant had an intention not to perform the act promised and had an intention to deceive the plaintiff. Valley Properties, Inc. v. Strahan,565 So.2d 571 (Ala. 1990); D.H. Holmes Dep't Store v. Feil,472 So.2d 1001 (Ala. 1985); Kennedy Elec. Co. v. Moore-Handley,Inc., 437 So.2d 76 (Ala. 1983). The question of a defendant's intention in making the alleged representation is ordinarily a question of fact. Martin v. American Medical Int'l, Inc.,516 So.2d 640 (Ala. 1987).
It was undisputed that the nursing home never intended to allow Mr. Cribbs to return as its patient. The evidence was in conflict, however, concerning whether the nursing home disclosed that intent to the hospital. The trial court's findings of fact recite, in pertinent part, the following:
 "[T]his court specifically finds that this intent was never disclosed to the hospital and any proffered testimony to the contrary is specifically found not to be credible by this Court.
 "The Court finds from the evidence that the fact the nursing home was not going to allow Mr. Cribbs to return was concealed from the hospital personnel with the intent to deceive the hospital into accepting [Mr. Cribbs] for a mental evaluation. Because of the relationship between the [hospital] and the [nursing home] which included frequent transfer of patients and disclosure of information about the patients for medical care purposes, the Court finds that the [nursing home] had a duty to disclose to the hospital [its] intention not to allow Mr. Cribbs to return to the nursing home.
 "This concealed plan of the [nursing home] was material information to the hospital in that had it been disclosed, alternative arrangements could have been made which included performing the mental evaluation in the nursing home. . . ."
The trial court made the following conclusions of law:
 "Based on the foregoing findings of fact, the Court concludes that the [hospital] has proven by clear and convincing evidence its *Page 792 
claims of fraud under §§ 6-5-101 and 6-5-102, Code of Alabama. As stated in the findings of fact, the misrepresentations by the [nursing home] were willful and made with the intent to deceive the [hospital]. The Court concludes that the [hospital] has proven by clear and convincing evidence that the [nursing home] engaged in fraudulent conduct with regard to the [hospital] which was gross and malicious in that the acts were done intentionally and wrongfully without just cause or excuse to the extent that punitive damages are appropriate under § 6-11-20, Code of Alabama."
This court has written:
 "Where the evidence is conflicting, the trial court is free to choose which evidence is believable and [to] resolve the conflicts. When . . . the trial court has the advantage of hearing the witnesses and observing their demeanor, Alabama law clearly accords the trial court's judgment the same weight as a jury verdict, and the trial court's judgment will not be disturbed on appeal unless plainly and palpably wrong."
Etno, Inc. v. Rivers, 644 So.2d 3, 5 (Ala.Civ.App. 1994) (citations omitted). "The [question of the] credibility of oral testimony is addressed to the trier of facts, and this court cannot substitute its own judgment for that of the trial court. The trial court was in a better position than we are to evaluate the witnesses' testimony." Kelley v. Kelley,628 So.2d 933, 934 (Ala.Civ.App. 1993) (citation omitted).
The trial court's findings of fact are not plainly and palpably wrong. Further, the court's conclusion that the hospital had proved its claim of fraudulent concealment by clear and convincing evidence is supported by the evidence and is not in error.
 Punitive Damages
The nursing home argues that the trial court was not authorized to award the hospital punitive damages. It claims that the hospital's evidence did not satisfy the "clear and convincing" standard set out in § 6-11-20, Ala. Code 1975. We have already held that the trial court's conclusion that the hospital satisfied its burden of proving fraud by clear and convincing evidence was not in error. Therefore, the trial court was authorized to award punitive damages. The nursing home did not question the amount of punitive damages awarded, and we note that the federal anti-patient dumping statute subjects a negligent violator of the statute to a civil penalty of not more than $50,000. See 42 U.S.C. § 1395dd(d)(1)(A).
 Compensatory Damages
John Glascock, the hospital business manager, testified that the hospital's "charges" for Mr. Cribbs were $25,236.50. Glascock stated that the charges included "each component that is attributed to th[e] patient . . . each aspirin, each pill." Glascock gave his opinion that the charges were fair and reasonable for the services provided to Mr. Cribbs. When the hospital submitted the charges to Medicare, it received two reimbursements from Medicare, a DRG reimbursement of $2,950.31, and a daily outlier reimbursement of $3,423.15, for a total reimbursement of $6,373.46.
Mr. Glascock was then questioned about the hospital's "cost to keep Mr. Cribbs during the 60-day period." Glascock replied that the "cost" was $641 per day. He stated that that figure was an average per diem cost for all patients, and he admitted that he could not answer specifically what it cost the hospital per day to keep Mr. Cribbs.
The trial court awarded the hospital compensatory damages of $32,086.54. That figure represents the per diem rate of $641, multiplied by 60, for a cost of $38,460, minus the Medicare reimbursement of $6373.46, for a total of $32,086.54.
The nursing home argues that the correct measure of damages should have been the $25,236.50 "charges" attributed to Mr. Cribbs, minus the Medicare reimbursement of $6373.46 for a total of $18,863.04. The hospital insists that the trial court's higher compensatory damages figure was supported by the evidence and is due to be upheld.
"The basic rule of tort compensation is that the plaintiff should be put in the position that he would have been in absent the defendant's negligence." Keel v. Banach, *Page 793 624 So.2d 1022, 1029 (Ala. 1993). "Whenever recovery is sought for expenses incurred as a result of another's wrong, the measure [of damages] is the amounts expended which were reasonable under the circumstances." C. Gamble, Alabama Law ofDamages § 7-3 at 51 (3d ed. 1994). The correct measure of damages in this case, therefore, is the amount the hospital reasonably expended to provide care for Mr. Cribbs for 60 days, less any reimbursement it received. See Note, PreventingPatient Dumping: Sharpening the COBRA's Fangs, 61 N.Y.U.L.Rev. 1186, 1219 (1986) ("in order to establish the actual amount of damages . . . the hospital would need to show . . . detailed proof, such as the hospital's record sheets of the amount of uncompensated care provided on behalf of patients dumped from the transferring hospital").
A portion of COBRA that prohibits patient "dumping" by hospitals receiving Medicare funds provides:
 "Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located and such equitable relief as is appropriate."
42 U.S.C. § 1395dd(d)(2)(B) (emphasis added). We have found no Alabama case discussing whether the amounts reasonably expended by a hospital for a patient's care are more correctly reflected by its "charges" to the patient or by its "per diem cost." One commentator has observed:
 "The relationship between 'charges' and 'costs' has long been a contentious issue in which different [third-party] payers trade accusations regarding the extent to which some payers subsidize others. . . . The charge structure [is] simply a mechanism for allocating . . . costs between Medicare and other payers. The point is troubling only if one theorizes that price 'reflects true value in a market equilibrium,' as in the neoclassical economic models. Price might instead be thought of as a firm's means of allocating its costs of production across its customers. Suppose, for example, I had paid $50 for five books that I now wish to resell. Suppose I want a 10% profit. In my sale of all five books, I have to garner a total of $55. Suppose that one customer does not bargain very hard. He pays $12. Suppose three other customers have paid $11. That means I can sell the last book for $10 to a customer who bargains very hard, and still hit my target. My prices have simply allocated my costs among my different customers."
D. Frankford, The Complexity of Medicare's HospitalReimbursement System: Paradoxes of Averaging, 78 Iowa L.Rev. 517, 539 n. 76 563 n. 168 (1993). Frankford explains that when Medicare went into effect in 1967, hospitals were paid on a retrospective cost-based reimbursement system; that is, they were reimbursed after the fact for their "reasonable costs" of furnishing goods and services to Medicare beneficiaries. Frankford at 530. Beginning in 1983, however, "a revolutionary change in the basic structure of hospital reimbursement" occurred. Frankford at 566. Under the new system,
 "[e]ach hospital [was] paid no more than a specified amount per Medicare patient stay, and the limit on the amount of payment to the hospital [was] set without regard to the actual number of days of care each patient received or the per diem cost the hospital incurred to furnish this care."
Frankford at 567. Today hospitals are reimbursed prospectively; they are told ahead of time what they can expect in the way of Medicare reimbursement for each type of hospital stay, and it is up to the hospitals to make ends meet. Frankford at 523.
 "[W]hen a patient enters the hospital, she is diagnosed and is classified under one of the 469 diagnosis related groups (DRGs), and the hospital is paid a predetermined sum for her care. If the hospital can care for the patient for less than the fixed sum, it may keep the surplus as profits. If, however, the cost of the care exceeds the fixed payment, the hospital must absorb the additional cost. The purpose of the new system is to encourage efficiency by providing economic incentives to spend less." *Page 794 
Note, Preventing Patient Dumping: Sharpening the COBRA's Fangs, 61 N.Y.U.L.Rev. at 1194.
Although each hospital patient may generate relatively distinctive expenses, hospitals are not attuned to monitoring individual expenses because hospital reimbursement (and therefore hospital "charges") depend on an aggregate or average formula, under which the cost of care to a particular individual is largely irrelevant. Frankford at 535. Thus, Frankford concludes, a hospital's charges for a Medicare patient "in part reflect what Medicare pays." Frankford at 640.
Glascock, the hospital business manager, conceded that the per diem "cost" upon which the trial court's compensatory damages award was based was an average cost for all patients and bore no direct relationship to the "cost" of caring for Mr. Cribbs. Moreover, Glascock could not state what were the costs attributable to Cribbs. He did testify, however, that the hospital "charges" reflected "each component that is attributed to [Cribbs] . . . each aspirin, each pill." He also stated that the charges were fair and reasonable for the services provided to Cribbs.
Based on the foregoing authorities, we recognize that the hospital's "charges" may not have reflected the entire cost the hospital incurred to care for Mr. Cribbs. However, we also recognize that "a party claiming damages has the burden of establishing by competent evidence the existence of an entitlement to damages and the amount of those damages." Marcusv. Lindsey, 592 So.2d 1045, 1046 (Ala. 1992). "The award of damages cannot be made upon speculation, and the plaintiff has the burden of offering evidence tending to show to the required degree, the amount of damages actually suffered." Johnson v.Harrison, 404 So.2d 337, 340 (Ala. 1981).
Other than its "charges," the hospital presented no evidence of what it expended specifically to care for Mr. Cribbs. The trial court's judgment awarding compensatory damages based on a per diem amount — which even the hospital conceded was an "average cost" not specifically applicable to the care of Mr. Cribbs — was in error. The judgment awarding compensatory damages is reversed, and the cause is remanded for entry of a judgment awarding compensatory damages of $18,863.04.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THIGPEN and YATES, JJ., concur.
ROBERTSON, P.J., and MONROE, J., concur in part and dissent in part.
[1] The term "dumping" is derived from a provision of the Comprehensive Omnibus Budget Reconciliation Act of 1986 (COBRA) that prohibits patient dumping by hospitals that receive Medicare funds. See 42 U.S.C. § 1395dd. Patient dumping is
 "a phenomenon . . . which occurs when a hospital that is capable of providing the needed medical care (the transferring hospital) sends a patient to another facility (the receiving hospital) or simply turns the patient away because the patient is unable to pay."
Note, Preventing Patient Dumping: Sharpening the COBRA's Fangs, 61 N.Y.U.L.Rev. 1186, 1186-87 (1986).
[2] See 42 U.S.C. § 1395x(l), a Medicare provision recognizing "transfer agreements" between hospitals and skilled nursing facilities.