This appeal by Interstate Engineering, Inc., a corporation, is from a judgment entered on a jury verdict of $200,000 in favor of Janelle K. Burnette, administratrix of the estate of James Kenneth Burnette, deceased, as damages for the wrongful death of her son and intestate, Kenneth Burnette.
Kenneth died from inhalation of carbon monoxide fumes generated by a fire that destroyed the home of his mother and his father, William J. Burnette, on 13 February 1981. Suit was filed under the theory of Alabama's Extended Manufacturer's Liability Doctrine.
Interstate claims error in the denial of its motion for directed verdict, motion for new trial or, in the alternative, motion for JNOV, motion for remittitur, and the giving of a jury instruction regarding the sudden emergency doctrine.
The thrust of plaintiff's case is that certain heat sensors manufactured by Interstate were defective and failed to respond, and signal, at 136 degrees Fahrenheit as they were designed to do.
In order to resolve the issues, it is necessary to state the tendencies of the evidence: Kenneth Barnette died from smoke inhalation when he failed to escape the burning home. About four years before the fire, the Burnettes bought three heat detectors and one smoke detector manufactured by Interstate. The heat detector located in Kenneth's bedroom is that which gave rise to this action. These devices were not altered or unpackaged before the sale of them to the Burnettes. They were installed by a salesman of the seller who had been trained by Interstate's representative to sell and install these products.
An instructional manual entitled "Safe at Home" accompanied the detectors when delivered to the Burnettes. The detectors required no maintenance. Regular testing of the devices was encouraged by Interstate and done by the Burnettes as recently as one month before the fire.
The heat detector in question, a Vanguard Thermosonic Model V-50 FT, was a mechanically operated unit, powered by a coiled spring motor, and designed to make a loud, school-bell or burglar-alarm sound. A Model V-50 FT was activated in a demonstration conducted before the jury; the jury heard the loud alarm which the detector in Ken's bedroom was designed to sound. In the presence of a temperature of 136 degrees Fahrenheit, a round heat-sensitive sensor on the front of the device *Page 626 
should melt, releasing the coiled spring and activating the alarm.
At approximately 12:45 on the morning of the fatal fire, Janelle Burnette's husband awakened and told her the house was on fire. Neither the smoke detector, located in the hallway, nor the three heat detectors (located in the kitchen, guest bedroom, and Kenneth's bedroom respectively) had activated to sound an alarm up to the time Mr. and Mrs. Burnette awakened.
Mrs. Burnette got out of bed and entered the adjoining hallway. She looked down the hall in the direction of the dining room and Kenneth's bedroom, in the presence of thick dark smoke, and saw flames in the ceiling of the dining room and in the hallway, directly adjacent to Kenneth's bedroom door. The top of the separating wall between his bedroom and the dining room was also in flames and flames were coming down through the ceiling. The heat detector in Kenneth's bedroom was located within a few inches of the ceiling, approximately two feet from his bedroom door, and immediately adjacent to the visible flames in the dining room, hallway, and separating wall area. Despite its proximity to the flames, the heat detector in Kenneth's room did not sound an alarm. Neither did the heat detector in the kitchen.
The location of the smoke and flames provoked his father to call Kenneth, who answered. Mrs. Burnette turned, spoke briefly to her husband, and began leaving the house. While she made her way out, her husband again called out to Kenneth to say "Let's go, this house is going fast, let's get out of here." To this second call of warning from his father, Kenneth gave no reply.
While Mrs. Burnette was making her way out of the house, the heat detector in the guest bedroom went off. This was the first alarm sounded. The heat detector in Kenneth's bedroom still had not activated. However, the flames were adjacent to the detector in Kenneth's room and closer to it than to the detector in the guest bedroom.
After exiting the house, Mrs. Burnette went for help. Sometime after 1:15 a.m., after the Burnettes had once attempted to re-enter the burning house but were unable to do so because of the extent of the fire, the first volunteer fireman, Edward Terrell, arrived. At that time, more than thirty minutes after the Burnettes had awakened, the house was ablaze. As fire and smoke came underneath the eaves and through the gables all across the house, other people began to arrive. Unable to work the fire truck, they moved a car parked in front of the guest bedroom, for fear of it exploding, then stood back and watched the house burn.
By this time, the house was described as "bubbling," "boiling," and "caving in." The crowd stood 75 to 100 feet back from the house because of the heat, as a witness said, "far away from it so that the heat wouldn't blister you." Then, as the house burned out of control, twenty to thirty minutes after Edward Terrell arrived, and as much as one hour after the heat detector in the guest bedroom went off, a second heat detector went off. This alarm was not sounding when Terrell arrived, he had not heard any prior alarm go off, and there is no evidence that any other alarms, other than the one in the guest bedroom, that went off approximately one hour earlier, were ever activated. All the detectors were completely destroyed in the fire.
Mrs. Burnette testified the heat detectors were tested properly and regularly but not under heat or fire conditions. The testing is to ensure the detector is wound and the spring loaded. The test does not indicate whether the detector will adequately respond to heat or fire. Based on the recommended testing of the product, one cannot know whether the detector will actually perform its intended function and alarm a person in the presence of high temperatures.
Interstate challenges both the sufficiency and the weight of the evidence, by motion for a directed verdict, motion for a new trial or, in the alternative, a motion for JNOV. Accordingly, the appropriate standards of review, presented respectively, are *Page 627 
whether the evidence, when viewed in a light most favorable to the non-moving party, furnishes any support for the theory of the complaint and whether the judgment entered, based on the weight and sufficiency of the evidence presented, is palpably wrong or manifestly unjust. Casey v. Jones, 410 So.2d 5 (Ala. 1981); Chavers v. National Security Fire and Casualty Co.,405 So.2d 1 (Ala. 1981).
Relying principally upon Sears, Roebuck Co. v. Haven HillsFarm, Inc., 395 So.2d 991 (Ala. 1981), Interstate argues a directed verdict should have been entered in that plaintiff failed to prove any defect in the heat detectors. In support of this argument, Interstate emphasizes the absence of any expert testimony concerning the allegedly defective heat detector.
This court, in Sears, found reversible error in the trial court's denial of defendant's directed verdict motion in light of the plaintiff's failure to prove that a tire blowout was causally related in fact to the tire's defective condition at the time of its sale by Sears. The basis of this finding was the proposition that the mere failure of a product does not presuppose the existence of a defect.
Quoting with approval from Shramek v. General Motors Corp.,Chevrolet M. Div., 69 Ill. App.2d 72, 77-78, 216 N.E.2d 244, 247
(1966), this court noted:
 "`The mere fact of a tire blowout does not demonstrate the manufacturer's negligence, nor tend to establish that the tire was defective. Blowouts can be attributed to myriad causes, including not only the care with which the tires are maintained, but the conditions of the roads over which they are driven and the happenstance striking of damaging objects.'"
Sears, Roebuck Co., 395 So.2d at 996.
The extent of the evidence regarding a defect in Sears was that a 4 1/2-month-old tire, driven approximately 30,000 miles, blew out while mounted on a heavily laden truck, on a paved highway, under normal weather conditions. This evidence, without more, was insufficient to prove a prima facie case under the Alabama Extended Manufacturer's Liability Doctrine.
In contrast to the Sears decision, where the cause of a product's failure could be determined only by speculation and conjecture, the tendencies of the evidence in the case at bar, without question, point to one theory of causation, namely, that the heat sensor within the Vanguard heat detector was defective and was defective when Interstate released the product into the stream of commerce.
For example, the evidence shows the Burnettes purchased three new Vanguard heat detectors from a distributor in Tuscaloosa, Alabama. The heat detectors were still individually wrapped and boxed. The heat detectors were installed, unaltered, in the Burnette home in a manner suggested by the owner's manual.
As the manual suggested, the heat detectors were tested each month, including within a month of the fire, by ensuring a coiled spring was operative, and left in a "cocked" position. On every testing occasion, the spring device was found to work properly. This testing procedure, however, did not, nor was it intended to, test the heat sensor, which, in the event of a fire, was designed to melt and thereby release the coiled spring, sounding the alarm.
As suggested by the owner's manual, the Burnettes left the heat detectors undisturbed. In fact, the manual clearly states that, other than the testing procedures outlined above, no maintenance was required.
Accordingly, the evidence supports a finding that the heat detectors were properly installed, tested, maintained, and otherwise left undisturbed.
Nevertheless, the evidence supports a finding that on the evening of the fatal fire, two heat detectors, one in Kenneth's room, failed to operate as they were intended. As noted above, the heat detector in Kenneth's room was immediately adjacent to the flames but failed to activate before the detector in the guest bedroom.
Moreover, approximately one hour after the heat detector in the guest bedroom was *Page 628 
activated, at a time when the house was described as "boiling" and "caving in," a second alarm sounded. By this time, the heat was so intense that onlookers stood some 75 to 100 feet from the house to avoid being blistered.
While the defense did proffer alternative explanations for the heat devices' failure, we find the jury could have reasonably concluded that the heat sensors within the Vanguard heat detectors failed to melt at 136 degrees Fahrenheit as designed, but, rather, melted at a much higher temperature. Accordingly, having proven that the detectors were in effect "inferno activated," we find Mrs. Burnette met her burden of proof by establishing that the Vanguard heat detectors were not fit for their intended purpose and were unreasonably dangerous.Sears, Roebuck Co. v. Haven Hills Farm, Inc., 395 So.2d at 994. Furthermore, we find the evidence supports a finding that the heat detectors' failure of performance is causally related in fact to the product's defective condition at the time of sale. Id., 395 So.2d at 995.
While the use of expert testimony would certainly have been preferable, in light of the attendant circumstances of the case, it was not required. Id., 395 So.2d at 995.
Interstate further contends Mrs. Burnette failed to present any evidence that the heat detector's failure was the proximate cause of Kenneth's death. We cannot agree.
Evidence presented at trial shows that Kenneth was awakened prior to any alarm having been sounded, but not before thick black smoke had engulfed the hallway adjacent to Kenneth's room, as well as the dining room. Kenneth responded to his father's initial cries of alarm, not from his bedroom, but, rather, from the living room. However, Kenneth failed to respond on a second occasion. Lastly, Kenneth's body was found less than five feet from the front door in the living room.
The tendencies of the evidence support an inference that smoke and flames adjacent to Kenneth's room blocked his exit through the hallway which led to his parent's room. Thus, Kenneth sought to escape through the guest bath and bedroom. However, before escaping, and within feet of an exit, Kenneth was overcome by carbon monoxide fumes. Under the facts, a jury could reasonably conclude that had the heat detector worked as it was intended, and provided an early warning of danger, Kenneth could have escaped from the house. In other words, the jury was entitled to find that the natural and probable sequence of events which led to Kenneth's death was proximately caused by the defective condition of the Vanguard heat detector. C.f. City of Mobile v. Havard, 289 Ala. 532,268 So.2d 805 (1972), and Havard v. Palmer Baker Engineers, Inc.,293 Ala. 301, 302 So.2d 228 (1974).
Lastly, the trial court properly gave the jury the following "sudden emergency doctrine" instructions:
 "The law says that if a person without fault of his own is faced with a sudden emergency, he is not to be held to the same correctness of judgment or actions as if he had time to fully consider the situation, and the fact, if it be a fact, that somebody does not choose the best or the safest way of escaping peril or injury, is not necessarily negligence or contributory negligence."
This charge is a correct statement of the law in Alabama. SeeEx parte Rollins, 403 So.2d 918, 921 (Ala. 1981); Williams v.Worthington, 386 So.2d 408, 409 (Ala. 1980).
Interstate argues it was error to give the sudden emergency charge in that the peril of the fire was not "of the defendant's making." See Green v. City of Birmingham, 241 Ala. 684, 4 So.2d 394 (1941). First of all, as discussed above, evidence does exist warranting the conclusion that Kenneth forced to take an alternative escape route due to the failure of the heat detector sold by the defendant.
Second, we find the better view to be that embraced by A.P.J.I. 28.15, that so *Page 629 
long as the injured party did not voluntarily place himself in a position of danger or peril, the sudden emergency charge is proper regardless of the defendant's contribution to the peril.Cf. Ex parte Rollins, supra,
Interstate argues further that Kenneth voluntarily encountered the peril by attempting to re-enter the burning house. While evidence was presented to raise such a theory, the jury apparently rejected it in favor of a finding that Kenneth was overwhelmed by smoke and carbon monoxide before he could escape.
For the reasons assigned, the judgment is due to be, and it is hereby, affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, ALMON and ADAMS, JJ., concur.