669 So.2d 855 (1995)
LEMOND CONSTRUCTION COMPANY
v.
Richard C. WHEELER.
1930866.
Supreme Court of Alabama.
September 29, 1995.
*857 Charles E. Sharp, Michael W. Ray and Joel A. Williams of Sadler, Sullivan, Herring & Sharp, P.C., Birmingham, for Appellant.
Kenneth Ingram, Jr. and Larry W. Morris of Morris, Haynes, Ingram & Hornsby, Alexander City, Michael D. Cook, Valley, for Appellee.
William D. Coleman of Capell, Howard, Knabe & Cobbs, P.A., Montgomery, for amicus curiae Alabama Branch, Associated General Contractors of America, Inc.
PER CURIAM.
Lemond Construction Company (hereinafter referred to as "Lemond") appeals from a judgment entered on a jury verdict in a wrongful death action rendered in favor of the plaintiff, Richard Wheeler, the father of a minor child, Christopher Wheeler. We affirm.

*858 I.
In the early morning hours of June 6, 1992, Christopher ("Chris") Wheeler, age 13, was a passenger in an automobile driven by Jason Colley, then age 15. He was killed when Jason lost control of the vehicle and the vehicle struck a group of trees.
Chris and Jason were friends and neighbors in Lanett. On Friday, June 5, the night of Jason's 15th birthday, Chris was "sleeping over" at Jason's home. Both children were to leave the next morning with Chris's parents for a trip to Florida.
However, sometime after midnight, the boys decided to take Jason's father's car for a ride. Jason drove, and they rode without incident for about a half-mile before returning home. Sometime later, but still in the early morning of June 6, Chris wakened Jason and the two decided to take the car for another drive. While riding around town, a City of Lanett police officer noticed their vehicle. Because Jason had driven into an intersection marked "Do Not Enter," the officer suspected that the driver of the vehicle might be under the influence of alcohol and began to follow it. When Jason saw that a police patrol car was following him, he attempted to elude the patrol car, and a high speed-chase ensued. The evidence indicated that as the chase proceeded down Magnolia Road Jason's vehicle may have reached speeds as great as 70 miles per hour. However, after crossing railroad tracks at a high speed, Jason became frightened and slowed down to 35 or 40 miles per hour. The vehicle then came upon an unmarked road construction area, where Jason lost control, and the vehicle struck two large trees. Both boys were thrown from the car, and Chris suffered a fatal head injury. The area of Magnolia Road "under construction" was part of a project to upgrade the city's sewer system. Lemond was the contractor employed by the city to perform the work on that project.
In August 1992, Richard Wheeler filed a wrongful death action against the City of Lanett and Lemond. The complaint alleged that the city and its police officers had acted in a negligent or reckless and wanton manner in pursuing the vehicle driven by Jason and that the city had also negligently and/or wantonly failed to maintain Magnolia Road in a safe condition. It further alleged that Lemond had negligently and/or wantonly failed to leave the roadway in a safe condition at the end of a workday and had negligently and/or wantonly failed to place warning signs that Wheeler says were needed to alert motorists to the condition of the roadway. Wheeler alleged that the negligence and/or wantonness of the defendants combined or concurred to cause Chris's death.
Wheeler eventually settled his claim against the City of Lanett, and the city was dismissed from the action. Lemond answered the complaint by denying the allegations and asserting the defenses of assumption of the risk and contributory negligence. It also asserted that the accident was proximately caused by an intervening cause unrelated to any of its own acts or omissions. The case went to trial in November 1993.
At trial, Wheeler argued that Lemond had breached its duty of care to the public by failing to perform the construction work in accord with the plans and specifications prepared for the city by Engineering Service Associates, Inc. As a part of the project, trenches were dug across the road surface so that sewer pipe could be laid beneath the road. Once the pipe was laid in the trench, the trench was filled with gravel to within a few inches of the road surface. The last few inches of the trench were then filled to level with the road with a material known as "crusher run," a type of crushed stone, prior to later final road resurfacing. Wheeler argued that the contract required the use of temporary asphalt, rather than "crusher run," which can be dislodged from the trench by vehicular traffic. In contrast, Lemond argued that the contract called for the use of "crusher run" as the top layer of fill material. Wheeler offered evidence that the trenches in Magnolia Road were as much as eight inches deep at the time of Chris's fatal accident and that in that condition the road was not safe to drive an automobile on. Lemond offered contradictory testimony indicating that the road surface was in a safe condition when its employees left the work site at the end of the day on June 5 and at the time of the accident. Wheeler offered evidence that *859 Lemond was required by the contract to post warning signs or other devices along the roadway to warn motorists of the construction area. Lemond argued that such signs were not required because the road was always in a normal driving condition when it was opened to regular traffic.
Lemond moved for a directed verdict in its favor at the close of Wheeler's case-in-chief, asserting that Jason's actions as an underage, unlicensed driver fleeing from police were the intervening proximate cause of Chris's death, and that the death was not proximately caused by any condition of the roadway. The trial court denied the motion. Lemond renewed its motion for a directed verdict at the close of all evidence, but the court again denied it. At that time, Wheeler moved for a directed verdict on Lemond's assumption-of-the-risk defense and its contributory negligence defense, arguing that, as a 13-year-old, Chris could not have "assumed the risk" and could not have been contributorily negligent. The trial court granted the motion. The case was then submitted to the jury, which returned a verdict in favor of Wheeler and set punitive damages against Lemond at $3,500,000. Lemond moved for a J.N.O.V. or, in the alternative, a new trial or a remittitur of damages. After a hearing on the issues raised by Lemond, the trial court denied the motion. Lemond appealed.

II.
Lemond first argues that the trial court committed reversible error by allowing Wheeler's expert on construction contracts to testify as to whether Lemond had complied with the technical specifications that were a part of the contract between the City of Lanett and Lemond. Lemond argues that it was error to allow an expert offered by a person not a party to a contract to testify as to the meaning of the contract. In response, Wheeler contends that because the trial court ruled, as a matter of law, that the contract was ambiguous, his expert's testimony was admissible to assist the jury in determining the meaning of the contract.
This case is not the usual case involving the meaning of a contract where the two parties to the contract dispute its meaning and are on opposite sides of a lawsuit. Here, the dispute is between Lemond, a party to the contract, and Wheeler, who is not a party to the contract. The meaning of the contract was at issue in this case because the contract requirements set forth in the project specifications regarding preparation of the road surface for the safe passage of vehicular traffic is one means by which Lemond's duty to the public could be measured. The trial court concluded, as a matter of law, that the contract was ambiguous as to whether the specifications required "crusher run" or temporary asphalt to cap the sewer pipe trenches until the road was resurfaced. Once a trial court determines that a contract is ambiguous or that its terms are of doubtful meaning, the question of the true meaning of the contract becomes a question for the jury to decide. Dill v. Blakeney, 568 So.2d 774 (Ala.1990); Rivers v. Oakwood College, 442 So.2d 74 (Ala.1983); Miles College, Inc. v. Oliver, 382 So.2d 510 (Ala.1980).
The trial court determined that expert testimony would assist the jury in interpreting the technical language in the engineering specifications. Expert testimony is admissible where technical trade terms and expressions in a contract are peculiar to a specialized discipline and are not of common knowledge. Flagg-Utica Corp. v. City of Florence, 275 Ala. 475, 156 So.2d 338 (1963). See Miles College, supra; W.L. Shepherd Lumber Co. v. Atlantic Coast Line R.R., 216 Ala. 89, 112 So. 323 (1927); Richard P. Baer & Co. v. Mobile Cooperage & Box Mfg. Co., 159 Ala. 491, 49 So. 92 (1909); McCombs v. Stephenson, 154 Ala. 109, 44 So. 867 (1907). Furthermore, "[a] ruling on the admissibility of expert testimony is largely within the discretion of the trial court and will not be overturned unless that has been an abuse of discretion." Tidwell v. Upjohn Co., 626 So.2d 1297, 1300 (Ala.1993). Accordingly, the trial court did not err in admitting the testimony of Wheeler's expert witness.

III.
Lemond next argues that the trial court committed reversible error by directing a verdict for Wheeler on the issues of assumption *860 of risk and contributory negligence. It is well settled under Alabama law that a child between the ages of 7 and 14 is prima facie presumed incapable of contributory negligence; however, that presumption may be rebutted by evidence that the child possesses the discretion, intelligence, and sensitivity to danger that an ordinary 14-year-old child possesses. Savage Industries, Inc. v. Duke, 598 So.2d 856 (Ala.1992); Works v. Allstate Indemnity Co., 594 So.2d 60 (Ala. 1992); Birmingham Ry. Light & Power Co. v. Jones, 146 Ala. 277, 41 So. 146 (1906).[1] Chris was only 13 years of age; thus, the law presumes that he was incapable of contributory negligence. Similarly, because a child of that age is deemed incapable of appreciating the danger of a situation in which he may place himself, see Southern Express Co. v. Roseman, 206 Ala. 681, 91 So. 612 (1921), it follows logically that the child is also presumed incapable of assuming the risk of his action.
Given these presumptions, it was Lemond's burden of proof to present sufficient evidence that Chris possessed the discretion, intelligence, and sensitivity to danger that an ordinary 14-year-old child possesses, in order to make the issues of assumption of the risk and contributory negligence questions for the jury. Following Wheeler's motion for a directed verdict on those issues, the trial court stated:
"I don't remember there being any evidence at all that suggested that this 13-year-old was capable of contributory negligence. The law very clearly places that burden on the defendant to show that, and there was no evidence offered in that regard.

"There was plenty of evidence offered about contributory negligence itself. But you could have called his daddy as an adverse witness. You could have put him on the stand, and you could have asked him what sort of boy he was. You could have sneaked right up on his blind side and you could have proved that he was an alert, intelligence person. Y'all didn't do it, and that is my honest and complete finding on that point. I think that you didn't meet your burden of proof in that.

"All right. So I won't be talking about contributory negligence, and I'll be going back through the [jury] charges and getting that part out of it. Likewise, I will not be charging [the jury] on any assumption of risk."
(Emphasis added.)
"The standard of review applicable to a directed verdict or to a denial of a motion for a directed verdict is whether the nonmoving party has presented substantial evidence in support of his position. If he has not, then a directed verdict is proper." K.S. v. Carr, 618 So.2d 707, 713 (Ala.1993). Even viewing the evidence in a light most favorable to Lemond, we conclude that Lemond did not present substantial evidence that Chris possessed the discretion, intelligence, and sensitivity to danger of an ordinary child of 14 years. We believe that the trial court was correct; although Lemond presented evidence that Chris may have acted negligently, that evidence did not relate to the issue in question, whether Chris possessed certain mental capabilities equal to that of an ordinary 14-year-old child.
Lemond also argues that Chris was engaged in an "adult activity" at the time of his death and therefore should be held to an adult standard of care. Under Alabama law, a minor conducting an "adult activity" is required to exercise the same degree of care as an adult. Gunnells v. Dethrage, 366 So.2d 1104 (Ala.1979). This argument might have some merit if Chris had been operating the automobile, an "adult activity." However, Chris was only a passenger riding in the vehicle; riding as a passenger is not an "adult activity." Although Lemond argues that Chris was more than a passive occupant in the vehicle, citing Jason's testimony that Chris urged him to *861 attempt to elude the police, it is undeniable that Chris was not in control of the vehicle at the time of the collision. Accordingly, the trial court correctly held that the rule recognized in Gunnells is not applicable to this case.
The trial court properly directed the verdict in favor of Wheeler on the issues of contributory negligence and assumption of the risk.

IV.
Lemond argues that the trial court committed reversible error by denying its motion for a directed verdict in its favor based upon Lemond's argument that Chris's death was caused by his intentional participation in an illegal activity. Lemond contends that this Court's opinion in Hinkle v. Railway Express Agency, 242 Ala. 374, 6 So.2d 417 (1942), mandates a directed verdict in its favor. This Court stated in Hinkle that "[a] person cannot maintain a cause of action if, in order to establish it, he must rely in whole or in part on an illegal or immoral act or transaction to which he is a party." 242 Ala. at 378, 6 So.2d at 421.
More recently, in Oden v. Pepsi Cola Bottling Co. of Decatur, Inc., 621 So.2d 953 (Ala.1993), this Court clarified the meaning of the that statement from Hinkle. In Oden, this Court held: "We interpret the rule in Hinkle to bar any action seeking damages based on injuries that were a direct result of the injured party's knowing and intentional participation in a crime involving moral turpitude." 621 So.2d at 955 (emphasis added). A crime involving moral turpitude is one involving conduct with an inherent quality of baseness, vileness, or depravity in regard to the duties one owes to society. Meriwether v. Crown Investment Corp., 289 Ala. 504, 268 So.2d 780 (1972); 58 C.J.S. Moral (1948).
Because Lemond presented no substantial evidence that Chris's actions as a passenger in the automobile driven by Jason involved base, vile, or depraved conduct, we conclude that the trial court correctly denied Lemond's motion for a directed verdict based on this issue.

V.
Lemond argues that the trial court committed reversible error by denying a mistrial based on a statement made by Wheeler's counsel during trial, which Lemond contends was a grossly improper and prejudicial attempt to impeach one of its witnesses. Lemond called Robert Vinson as a witness. Vinson was Lanett's chief of police at the time of Chris's fatal accident and had visited the scene shortly after the accident occurred.
One of the first questions asked by Wheeler's counsel on cross-examination of Vinson was: "And would you tell the jury, Mr. Vinson, when you left the police department on October the 5th of '92 whether you voluntarily left or whether you were fired by the City?" Lemond's counsel objected to the question and moved for a mistrial. After a lengthy discussion with counsel for both parties, the trial judge harshly reprimanded Wheeler's counsel for asking such a question without having what the judge believed was a sufficient basis to do so. However, he denied Lemond's motion for a mistrial. Instead, the trial judge gave the jury the following instruction:
"Ladies and gentlemen, the question that was put to the witness was not an appropriate question and there is no basis in fact. I've gone over the matter carefully with the attorneys. There was no basis in fact for a suggestion that Chief Vinson was at any time fired from his job. And I'll ask you to completely put that suggestion out of your minds. It has nothing to do with this case, anyway. So just disabuse yourself of anything about Chief Vinson's job situation."
A judge is vested with wide discretion in determining whether an incident that occurs during trial so affects the right of either party to a fair trial as to require a mistrial. Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313 (Ala.1992); General Motors Corp. v. Johnston, 592 So.2d 1054 (Ala.1992); Valley Building & Supply, Inc. v. Lombus, 590 So.2d 142 (Ala.1991). Accordingly, "[t]his Court will not reverse a trial court's ruling on a motion for a mistrial unless it is absolutely clear that its discretion has been abused." Wright v. Terry, 646 *862 So.2d 11, 14 (Ala.1994). Given the curative instruction the trial judge provided to the jury, we cannot hold that the judge clearly abused his discretion by denying Lemond's motion for a new trial.

VI.
Lemond also argues that the trial court committed reversible error by denying its motion for a directed verdict in its favor based upon Lemond's argument that the efficient intervening or proximate cause of Chris's fatal injury was Jason's operation of the automobile. As this Court has already noted, the standard of review applicable to the denial of a motion for a directed verdict is whether the nonmoving party, in this instance Wheeler, has presented substantial evidence in support of his position. Carr, supra.
A review of the trial record shows that Wheeler did present substantial evidence in support of his claim that Chris's fatal injury was caused by Lemond's conduct relating to the condition of Magnolia Road at the time of the accident.[2] Moreover, it is well established that the question of proximate cause is almost always a question of fact to be determined by the jury, and that the question must go to the jury if reasonable inferences from the evidence support the plaintiff's evidence. Garner v. Covington County, 624 So.2d 1346 (Ala.1993); Marshall County v. Uptain, 409 So.2d 423 (Ala.1981). Accordingly, the trial court properly denied Lemond's motion for a directed verdict based on this issue.

VII.
Lemond argues that the trial court erred in denying its motion for a new trial or, in the alternative, a remittitur of damages, based on what Lemond contends was an excessive verdict. The trial court conducted a hearing in review of the jury's damages award and issued a written order regarding Lemond's motion, consistent with this Court's mandate in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
The trial court denied Lemond's motion for a new trial, holding that "none of the grounds [raised in support of the motion] separately or collectively warrant the grant of this motion." On appeal from a trial court's denial of a motion for new trial, this Court must affirm unless the jury verdict is so contrary to the weight and sufficiency of the evidence, viewed most favorably to the nonmoving party, that it is palpably wrong or manifestly unjust. Interstate Engineering, Inc. v. Burnette, 474 So.2d 624 (Ala.1985); Empiregas, Inc. v. Wooten, 527 So.2d 1298 (Ala.Civ.App.1987). After a thorough review of the record, we conclude that the jury's verdict is supported by the evidence presented at trial and that the trial court correctly denied Lemond's motion for a new trial.
Under Alabama law, a jury's verdict is presumed correct and a motion for new trial or remittitur based on alleged excessiveness of a punitive damages award will be denied unless it is determined that the verdict is excessive as a matter of law or is the result of passion, bias, corruption, or other improper motive. Hammond, supra. In the trial court's order regarding Lemond's request for a remittitur, that court discussed the factors established in Hammond and Green Oil Co. and concluded:
"This Court feels that to order a remittitur here would be to usurp the function of the jury in a case in which this Court has determined that the verdict was in no way affected by bias, passion, prejudice, corruption or other improper motive or conduct. Accordingly, the defendant's motion seeking a remittitur in this case is denied."
Because the amount of damages to be awarded in a wrongful death action is largely within the discretion of the jury, where the trial court denies a new trial because *863 it does not find the verdict excessive, the presumption of correctness favoring the jury's verdict is strengthened. Deaton, Inc. v. Burroughs, 456 So.2d 771 (Ala.1984). After an independent review of the Hammond and Green Oil factors in relation to the evidence contained in the record of this trial, we agree with the trial court's holding. Accordingly, we hold that that court did not err in denying Lemond's motion for a remittitur.

VIII.
Finally, Lemond argues that its constitutional rights were violated by the jury's award of punitive damages because, Lemond contends, it did not engage in wanton conduct. Lemond argues generally that Alabama's wrongful death statute, Ala.Code 1975, § 6-5-410, violates several provisions of the Alabama Constitution of 1901 and several Amendments of the United States Constitution because it allows punitive damages to be levied against a party who may be guilty only of negligence and not wanton conduct. Although Lemond's constitutional challenge focuses on § 6-5-410, we note that § 6-5-391 is the statute creating a cause of action for the wrongful death of a minor. Because of the similarities of these statutes the arguments challenging § 6-5-410 could also apply to § 6-5-391. However, Lemond's argument on this issue lacks the specificity required in order for this Court to address it. Rule 28(a)(5), Ala.R.App.P.; Alabama Power Co. v. Turner, 575 So.2d 551 (Ala.1991), cert. denied, 500 U.S. 953, 111 S.Ct. 2260, 114 L.Ed.2d 713 (1991).
Lemond argues that the trial court erred in denying its motion for a directed verdict on the issue of wantonness. However, the record contains ample evidence to support a jury determination that Lemond's acts or omissions at issue in this case constituted wanton behavior. For example, in its Hammond order, the trial court noted:
"In this case there was creditable evidence before the jury, and indeed it was undisputed, that there were no warning signs placed by the defendant on the approach to the construction area in the direction in which the car occupied by the decedent was being driven. There was further creditable evidence before the jury that in the area where sewer construction was ongoing, that at the time of the accident resulting in the death of the decedent there were holes in the road created by the defendant which were from three to eight inches in depth and three feet wide. There was further evidence before the jury that prior to the accident in question, complaints had been made to the defendant's superintendent in charge of construction about the holes in the road in response to which the superintendent was quoted as saying:
"`I'm tired of the bitching about the road. We're going to take the cheapest way out.'
"One week later the child was killed. Additionally, there was testimony that the manner in which this job was handled was the usual and customary way all [Lemond's] jobs were handed. The defendant in this case could certainly foresee that the failure to post warning signs and the maintenance of the roadway with large potholes or depressions in it could likely cause serious injury or death to travelers on the roadway. Both under its contract with the City of Lanett and under applicable law the defendant was under a duty to maintain this roadway in a reasonably safe condition and the jury was certainly entitled to consider its failure to do so as culpable and reprehensible conduct on the part of the defendant."
Accordingly, Lemond's argument that it was assessed punitive damages based on only negligent conduct, rather than on wanton conduct, is without merit. The trial court correctly denied Lemond's motion for a directed verdict on the issue of wantonness.
Lemond also argues that it was prejudiced because there was no apportionment of damages among the joint tort-feasors involved in Chris's fatal injury, i.e., Lemond, the City of Lanett, and Jason Colley. Both the city and Jason settled with Wheeler before trial. However, this Court has repeatedly held that the general wrongful death statute, § 6-5-410, does not provide for apportionment of damages among joint tort-feasors. Rose v. Rogers, 632 So.2d 434 *864 (Ala.1994); Tatum v. Schering Corp., 523 So.2d 1042 (Ala.1988); Black Belt Wood Co. v. Sessions, 514 So.2d 1249 (Ala.1986). The same rule of nonapportionment also applies to damages awarded under § 6-5-391, the statute creating a cause of action for the wrongful death of a minor.

IX.
The judgment of the trial court is affirmed.
AFFIRMED.
ALMON, SHORES, COOK, and BUTTS, JJ., concur.
MADDOX, J., concurs in the result.
HOUSTON, J., dissents.
HORNSBY, C.J., and KENNEDY and INGRAM, JJ., recused.
MADDOX, Justice (concurring in the result).
I concur in the result. This is a wrongful death case, and in such cases this Court has consistently held that only punitive damages can be awarded. A majority of this Court has also consistently held that there can be no apportionment of punitive damages among joint tort-feasors in a wrongful death action. It is also an action that the Legislature has said is not affected by the so-called "tort reform" legislation passed in 1987, dealing with punitive damages. See, Ala.Code 1975, § 6-11-29.[3]
This case also involves claims of contributory negligence on the part of the decedent. This Court has considered contributory negligence on more than one occasion, but the issues regarding it remain the same.
In Killough v. Jahandarfard, 578 So.2d 1041, 1047 (Ala.1991), concurring in the result, I stated the following regarding Alabama law in wrongful death cases:
"I have always been of the opinion that wrongful death cases were in a different category insofar as the amount of punitive damages that could be awarded, but I have not agreed that Alabama's procedures were without Constitutional problems. See my opinion concurring in part and dissenting in part in Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812, 833 (Ala.1988). My opinion in Industrial Chemical was based primarily upon a statement made by the Supreme Court of the United States in Louis Pizitz Dry Goods Co. v. Yeldell, 274 U.S. 112, 47 S.Ct. 509, 71 L.Ed. 952 (1927): `We cannot say that it is beyond the power of the legislature, in effecting such a change in common law rules, to attempt to preserve human life by making homicide expensive.' 274 U.S. at 116, 47 S.Ct. at 510."
578 So.2d at 1048.
When the Legislature considered major "tort reform" legislation in 1987, it elected not to change the law of Alabama in wrongful death actions, such as this one, not involving a health care provider.[4] The Legislature has elected not to change the law that only punitive damages can be awarded in wrongful death actions. Neither has the Legislature seen fit to change the law of Alabama regarding the nonapportionment of punitive damages among joint tort-feasors, although certain members of this Court have believed that this Court should take such action. See, Tatum v. Schering Corp., 523 So.2d 1042 (Ala.1988) (Jones and Houston, JJ., dissenting).
The majority suggests that Lemond's constitutional claims lack specificity because they were not adequately briefed. I cannot find such a deficiency in the appellant's brief, and although the argument on those claims takes only three pages of the appellant's brief, it is succinct, it is cogent, and it sufficiently raises and addresses the appellant's constitutional claims. I set out the appellant's *865 argument on those claims in full to show the basis for my independent conclusion on the question whether the constitutional claims were adequately argued:
"VII. DEFENDANTS SUBSTANTIVE AND PROCEDURAL DUE PROCESS RIGHTS, AS WELL AS OTHER CONSTITUTIONAL RIGHTS, WERE VIOLATED BY THE IMPOSITION OF A $3,500,000 PUNITIVE DAMAGES VERDICT FOR SIMPLE NEGLIGENCE WITHOUT APPORTIONMENT BASED ON DEGREE OF CULPABILITY AND WITHOUT ADEQUATE STANDARDS FOR REVIEW.
"The award of punitive damages to the plaintiff in this case is violative of the due process clause of the Fourteenth Amendment to the Constitution of the United States and Article I, Section 6, of the Constitution of the State of Alabama. The imposition of punitive damages against Lemond based on the unbridled whim of the jury violates Article I, Sections 15 and 22, of the Alabama Constitution and the equal protection clause of the Fourteenth Amendment of the United States Constitution. The imposition of punitive damages against Lemond which are in the nature of a civil fine and punishment by requiring a burden of proof upon the plaintiff which is less than the burden of proof required in a criminal case is unconstitutional. The lack of sufficient standards by which the juries in Alabama, are allowed to be instructed as to the assessment of punitive damages violates the due process clause of the Fourteenth Amendment of the United States Constitution and Article I, Section 6, of the Alabama Constitution (1901). Such was the case in this trial. Further, the trial court's failure to adequately consider the factors detailed in Hammond v. City of Gadsden, [493 So.2d 1374 (Ala.1986)], and Green Oil Co. v. Hornsby, [539 So.2d 218 (Ala.1989)], and as discussed in this brief, in its post-verdict review denied Lemond of proper constitutional protection in the present case.
"The submission to the jury for the assessment of punitive damages based upon Lemond's simple negligence is in violation of the Fifth, Eighth, and Fourteenth Amendments of the Constitution of the United States of America. No other state or federal court system allows punitive damages for simple negligence. Lemond did not engage in any wanton conduct. The trial court erred in failing to grant Lemond's motion for directed verdict on the plaintiff's wantonness claim. There is no rational basis for the disparate treatment in Alabama. Alabama's wrongful death statute, [Ala. Code 1975,] Section 6-5-410 does not provide for the assessment of said punitive damages but rather is a result of improper and incorrect judicial interpretation. Tatum v. Schering Corp., 523 So.2d 1042 (Ala.1988), dissenting opinion of Justice Houston, Rose v. Rogers, 632 So.2d 434 (Ala.1993), dissenting opinion of Justice Houston. The Court is urged to reexamine this issue in view of the results of this case.
"In the matter at hand settlements had been reached with the co-defendant City in the amount of [$75,000] and potential co-defendant Colley in the amount of [$25,000]. Under the existing law of Alabama, the trial court instructed that,
"`For a wrongful death there can be only one recovery. That is, you will determine the amount of damages that can be awarded for the death of Chris Wheeler, if any. And, of course, I have already explained to you that the plaintiff would be entitled to recover only if they meet their burden of proof and prove negligence or wantonness and prove that it was a cause [of] death. But, if assuming that they prove that, then you will arrive at an amount based on rules of damages that I've given you. From that amount, [$100,000] will be subtracted.' (R. 1482-1483.)
"As pointed out by Justice Houston and Justice Jones in their dissenting opinion in Tatum v. Schering, supra, and Justice Houston again in Rose v. Rogers, supra, the lack of apportionment among joint tort-feasors in accordance with each defendant's culpability is unfair and unjust. The Court's instructions and the effect of the settlements unfairly violated Lemond's rights to due process by allowing imposition of punitive damages upon Lemond for actions of others.

*866 "The notions of `fundamental fairness' inherent in the concept of due process have been violated by this punitive damages award. The Supreme Court of the United States has recognized that
"`We need not, indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that a general concern of reasonableness ... properly enters into the constitutional calculus.'
"Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991). Clearly, this verdict is so `grossly excessive' as to violate the substantive component of the due process clause.
"Punitive damages `should not exceed an amount that will accomplish society's goal of punishment and deterrence' in wrongful death cases. General Motors Corp. v. Johnston, 592 So.2d 1054, 1063 (Ala.1992); Green Oil Co. v. Hornsby, 539 So.2d 218, 222 (Ala.1989). `Damages are considered excessive if they shock the judicial conscience of the court.' Land & Associates, Inc. v. Simmons, 562 So.2d 140, 150 (Ala. 1989). This excessive verdict violates Lemond's constitutional guarantees and is due to be set aside.

"CONCLUSION
"The blame for this otherwise inexplicable $3,500,000 verdict rests primarily on:
"(1) The illegal closing argument demanding $7,000,000 in punitive damages for Lemond's breaches of contracts all over the state. This results from the trial court's reversibly erroneous admission of a nonparty's expert's opinion that Lemond breached the construction contract with the City of Lanett in spite of the fact that it was undisputed by the parties that Lemond complied with the contract and there was no breach. The contract was not [ambiguous] and the intent of the parties thereto was never in dispute; and
"(2) The trial court's refusal to allow the jury the opportunity to find Wheeler personally responsible for his own negligent conduct when a directed verdict was erroneously and reversibly granted on the defense of contributory negligence.
"The trial court further erred by refusing to grant a directed verdict or judgment for Lemond. As a matter of law, the proximate cause and/or efficient intervening cause of this off-the-road collision was not any supposed breach of duty by Lemond, but rather the reckless and/or criminal conduct of Wheeler and his colleague Colley: At 3:00 a.m., these underage teens wrongfully took a Mercury Marquis without permission, license, or ability to safely operate it, and proceeded to evade arrest by speeding 70 miles per hour through a residential area while running stop signs, dodging construction cones, accelerating across a highway without looking, going airborne over railroad tracks, and ignoring the blue flashing light and siren.
"The trial court further failed to grant a mistrial, which it acknowledged was due to be granted when Lemond's primary witness was intentionally, falsely, and `poisonously' impeached without any basis in law or fact.
"When it is apparent that there has been a miscarriage of justice, the trial judge is under a duty to set aside the verdict. The trial judge stated near the end of the case, `[N]othing ought to come out of this case other than a defendant's verdict,' (R. 1187) and `in a world that's totally free of influences of various kinds, I would probably grant a directed verdict. But I think its better to let it go on and let the thing go. I don't think I ought to grant a directed verdict because its just not judicially economical to do that.' (R. 702) The truly excessive sum further evidences the gross miscarriage of justice requiring reversal and rendering of judgment for Lemond, or in the alternative a new trial or remittitur should be ordered."
Appellant's brief, pp. 75-79.
As I read this argument, the appellant is pleading with this Court for justice and is asking this Court to re-examine much of its prior law relating to the award of punitive damages for simple negligence and to the question whether there should be apportionment of damages among joint tort-feasors.
*867 The appellant also argues that Alabama is out of step with other states in its application of the rebuttable-presumption rule regarding contributory negligence of minors.
In the past, this Court has been requested on more than one occasion to fashion a different rule of law in cases such as this. This Court has been unwilling to change the law. The Legislature likewise has not elected to change the law.
If this Court desired to address those questions that it has been unwilling to address in the past, I would note that this case contains them all: an award of punitive damages for simple negligence, nonapportionment of damages against joint tort-feasors, contributory negligence and whether it should be considered in an award of damages, and last, but not least, question of excessiveness of the verdict, especially against this particular tort-feasor in view of the fact that there are joint tort-feasors and there was a serious argument that the decedent was contributorily negligent and had assumed the risk.
Based on the foregoing, and in view of the present state of the law in Alabama relating to punitive damages in wrongful death cases, I agree that the trial judge did not err, but I concur only in the result.
HOUSTON, Justice (dissenting).

I.
Although this case is not a contract action, the determination of whether Lemond complied with the requirements of the construction contract in question is essential to the outcome of the present case. This Court has set out the proper standard to be applied in assessing a contractor's liability for negligence in performing work on construction contracts. In McFadden v. Ten-T Corp., 529 So.2d 192 (Ala.1988), this Court agreed with the following statement from Hunt v. Blasius, 74 Ill.2d 203, 209, 23 Ill.Dec. 574, 577, 384 N.E.2d 368, 371 (1979):
"`An independent contractor owes no duty to third persons to judge the plans, specifications or instructions which he has merely contracted to follow. If the contractor carefully carries out the specifications provided him, he is justified in relying upon the adequacy of the specifications unless they are so obviously dangerous that no competent contractor would follow them. (Restatement (Second) of Torts sec. 404, Comment a (1965))....'"
McFadden, 529 So.2d at 200 (emphasis added; citations omitted). The Illinois Supreme Court in Hunt v. Blasius cited and quoted from the landmark case of Ryan v. Feeney & Sheehan Building Co., 239 N.Y. 43, 46, 145 N.E. 321, 321-22 (1924). The plaintiff's most damning line of attack in the present case was to argue that the trenches in question were improperly filled in.[5] The plaintiff's counsel argued that the trenches should have been covered with "bituminous" temporary pavement.
The first task for this Court is to determine what the "contract" is. Then we must determine whether the "contract" required that the trenches in question be covered with temporary asphalt at the time of the accident. The plaintiff arguedand the majority has accepted this argumentthat the engineering specifications, written by Engineering Service Associates ("ESA") for the City of Lanett for its entire West Shawmut area sewer improvement plan, of which the defendant Lemond Construction Company contracted only to do a small part, should be considered as the "contract." Even if this position is correct, the plaintiff presented no substantial evidence that the contract required the use of temporary asphalt. Section 2500-4(A)(8)(a), which deals with the repair of streets in connection with the installation of sewer lines, clearly states: "Where pipe trenches are cut across ... existing street ... pavement ..., they shall be backfilled ... and traffic restored as quickly as possible by the construction of a temporary surface of crushed stone or bituminous *868 material, as applicable." (Emphasis added.) The plaintiff points to § 2501-3(G)(2), which concerns traffic restoration, to buttress his argument that the contract required that temporary asphalt be used to cover the trenches. That section states that the contractor "shall either install a temporary bituminous pavement or the binder course, and maintain the temporary surface under traffic for at least 30 days" before to putting down permanent asphalt. (Emphasis added.)
The trial court ruled that the "contract" was ambiguous. "If the language of a contract is ambiguous or uncertain, the surrounding circumstances, including the construction placed on the language by the parties, are taken into consideration so as to carry out the intention of the parties." Walls v. Bank of Prattville, 575 So.2d 1081, 1083 (Ala.1991) (citing City of Montgomery v. Maull, 344 So.2d 492 (Ala.1977) (emphasis added)). Furthermore, "the ambiguities should be interpreted against the party drawing the contract if the circumstances surrounding the contract do not make the terms clear." United States Fidelity & Guaranty Corp. v. Elba Wood Products, Inc., 337 So.2d 1305, 1308 (Ala.1976).
There is uncontradicted evidence that the City of Lanett had always used crushed stone as temporary fill in prior similar sewer installations. There is also uncontradicted testimony that there was a mutual implied "understanding" that Lemond would use crushed stone.[6] The evidence also showed that the use of crushed stone was much more economical and that its use had been figured into the bid given by Lemond. The plaintiff put on no testimony contradicting the evidence of this implicit understanding. Mr. Darrell Brown, ESA's construction inspector, testified that the specifications allowed the use of crushed stone as a temporary filler, without any top coat of temporary asphalt. From the evidence of the custom, the course of dealings, and the other circumstances, including the regular inspection of the site by city officials and ESA's construction inspector without complaint,[7] the trier of fact could only have resolved any ambiguity as to the use of temporary asphalt in favor of Lemond. This is especially true in light of the requirement of Elba Wood Products, supra, that ambiguities be construed against the drafter. Because the specifications of this contract were drawn up for the city by ESA, a trier of fact would be required to construe the provisions in question in favor of Lemond.
"A jury is not free to ignore the undisputed testimony of unimpeached witnesses and substitute its own conclusions for that testimony." AmSouth Bank, N.A. v. Martin, 559 So.2d 1058, 1065 (Ala.1990) (citing Stinson v. Acme Propane Gas Co., 391 So.2d 659, 661 (Ala.1980)). Because the plaintiff presented no evidence contradicting Lemond's evidence as to the underlying circumstances, the course of dealing, and the underlying implicit understanding, the jury was bound to construe the ambiguity in favor of Lemond; therefore, the jury was required to read the contract as allowing the use of crushed stone without temporary asphalt.
The plaintiff's only evidence tending to show that the contract required the use of temporary asphalt was the improper opinion evidence of his expert Dr. James H. Deatherage. Dr. Deatherage, who currently teaches civil engineering at the University of Tennessee, has a Ph.D. in civil engineering. As the majority correctly points out, "[e]xpert testimony [as to the interpretation of construction contracts] is admissible where technical or trade terms and expressions in a contract are peculiar to a specialized discipline and are not of common knowledge." 669 So.2d at 859. The trial court correctly allowed Dr. Deatherage to testify as to the meaning of the term "binder course" as that term is used in § 2501-3(G)(2), so as to create a conflict with § 2500-4(A)(8)(a) and therefore establish *869 ambiguity. Such testimony, though, is not evidence as to how the ambiguity should be construed.
After asking Deatherage about the meaning of the term "binder course," the plaintiff's attorney asked him, "In your judgment, was asphalt placed across these ditches here pursuant to the terms and conditions of that contract?" (Emphasis added.) Deatherage answered, "No, not at all." The trial court erred in overruling the defendant's objection and in not striking the answer and instructing the jury to disregard it as an improper opinion. "Expert testimony cannot be received to prove to a court or jury what the proper or legal construction of any instrument or writing is." Della Ratta, Inc. v. American Better Community Developers, 38 Md.App. 119, 380 A.2d 627, 635 (Md.Ct. Spec.App.1977) (quoting 31 Am.Jur.2d, Expert and Opinion Evidence § 171, p. 736 (1967)). When Deatherage went beyond explaining technical terms and gave an opinion not only construing the contract but also improperly concluding that Lemond had breached the contract, he was no longer "assisting the trier of fact."[8] In Kennedy Elec. Co. v. Moore-Handley, Inc., 437 So.2d 76 (Ala.1983), this Court upheld the exclusion of expert testimony "which interpreted the contract for [the jurors]." The Court held: "It was for the jury to decide the meaning of the contract, and if the trial court excluded opinions that would have invaded the province of the jury in that regard, such action was entirely correct." Id. at 82 (citing Alabama Power Co. v. Williams, 222 Ala. 75, 130 So. 788 (1930)).
In light of the strong emphasis that the plaintiff's attorney placed in his closing statement on the improper opinion testimony and on the plaintiff's totally unsubstantiated contention that the "contract" required the use of temporary asphalt, the trial court's improper admission of Dr. Deatherage's opinion testimony, over objection, requires reversal. Furthermore, the trial court's allowing, over objection, the following statement by the plaintiff's counsel during the plaintiff's rebuttal during closing arguments also mandates reversal:
"As I recall, Mr. Lemond ... said from the witness stand, `No, I knew before I bid that we were going to use the crush and run [crushed stone] because I called.' I suggest to you [that] the other bidders bid it on the basis of the contract, and that's why he was low. [Objection overruled.] And he was low. He knew they were going to use the crush and run. And he uses it in every job.... It is apparent, it is apparent that they do it all over the State in every job. You want that to continue? You want them to live by the terms and conditions of the contract?.... You have the power. You can put a stop to it. A million dollars won't stop it."
(Emphasis added.) There was no substantial evidence that Lemond had any contractual obligation to use temporary asphalt. The magnitude of the damages award clearly demonstrates that the jurors had their reasoning poisoned by the improperly admitted opinion evidence, the effect of which was magnified by the arguments made by plaintiff's counsel in seeking punitive damages.

II.
"There is no room on the highways for multiple standards of conduct." Gunnells v. Dethrage, 366 So.2d 1104, 1106 (Ala.1979). "The overwhelming majority of jurisdictions hold minors to an adult standard in determining whether their conduct while engaging in an adult activity is negligent." Id. at 1105 (citing Robinson v. Lindsay, 20 Wash.App. 207, 579 P.2d 398 (1978), aff'd, 92 Wash.2d 410, 598 P.2d 392 (1979)); Prosser, Law of Torts, § 32, pp. 156-57 (4th ed. 1971); Annot., 97 A.L.R.2d 872 (1964). On the early morning of June 6, 1992, Christopher Wheeler, age 13, started a chain of events that led to his own tragic death. It is undisputed that Christopher woke up his 15-year-old *870 friend Jason Colley at 3:30 in the morning and convinced him to take Jason's parents' car out for a ride. Christopher knew that Jason was unlicensed and undoubtedly knew of the dangers of driving. When officers in a patrol car attempted to pull the boys over, Christopher, again according to uncontradicted testimony, encouraged Jason to run from the police. According to Jason's own testimony, Christopher "asked me to speed up a lot but never asked me to slow down." The question before this Court is: What standard of care should be applied to persons such as Christopher who endanger themselves and others?
Christopher instigated and encouraged illegal and wanton conduct. It is only by the grace of God that other persons, including his friend Jason, were not likewise killed or maimed. This Court in Gunnells, 366 So.2d at 1106, squarely held that there is only one standard of care to be applied to all persons using the highways of this State. If Christopher had been driving, no one would argue that any special reduced standard of care should have been applied to him. What is the difference here? Can the members of this Court honestly believe that Christopher is any less responsible for the reckless acts of June 6, 1992, or that his conduct is any less a threat to Alabama's motorists?[9] Christopher was just as much involved in an adult activity as Jason was, and the same public policy concerns that would mandate holding Jason to an adult standard apply equally to Christopher.
In 1991, the most recent year for which the Alabama Department of Economic and Community Affairs has published figures, there were 112,854 reported automobile accidents, 41,660 reported injuries, and 1,110 reported deaths on Alabama's highways. Alabama County Data Book 1991-92 p. 46 (Alabama Department of Economic and Community Affairs, 1992). Is this Court prepared to explain to the families of persons killed in the future, because of similar reckless conduct on the part of minors such as Christopher illegally using our State's highways, why instigating the illegal taking of an automobile and inciting highly dangerous hot pursuits should not be deterred to the fullest extent possible?
I would reverse the judgment and remand the case, because I would hold that the trial court erroneously directed a verdict on the issue of contributory negligence and, consequently, erroneously failed to charge the jury as to contributory negligence. As this Court held in Gunnells, 366 So.2d at 1106, "[i]n determining whether a minor has knowledge of the circumstances and the probable consequences of his acts or omissions on the highways, he must be held to the same standard as all other users of the highways." (Emphasis added.)
NOTES
[1] In Lyle v. Bouler, 547 So.2d 506 (Ala. 1989), this Court adopted Restatement (Second) of Torts § 339 (1965) as the standard for determining when a child may recover for injuries sustained as a trespasser or a licensee on land. This Court also provided several elements useful in applying a "flexible" standard for determining when a child will be held responsible for his or her actions. We note that Lemond failed to offer substantial evidence as to these elements.
[2] The plaintiff presented evidence indicating that at the time of the accident fill material had become dislodged from many of the sewer trenches, leaving trenches from two to eight inches deep across the surface of the road, and indicating that the construction area was not marked by any warning signs or lights. The plaintiff also presented testimony indicating that the road surface was unsafe at speeds above 25 miles per hour.
[3] Section 6-11-29 provides:

"This article [Article 2, "Punitive Damages"] shall not pertain to or affect any civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, as amended."
I assume this action was filed according to § 6-5-391.
[4] Legislation setting a cap on punitive damages in wrongful death cases involving health care providers was recently declared unconstitutional in Smith v. Schulte, [Ms. 1930362 and 1930459, August 18, 1995] ___ So.2d ___ (Ala.1995).
[5] Because the undisputed evidence shows that the automobile in which Christopher was riding had run five stop signs, crossed a four-lane highway, and crossed a railroad track without stopping or slowing down, all in an attempt to outrun the police, I question whether Lemond's failure to erect signs or flashing lights at the construction site was a proximate cause of Christopher's death; however, that may be for the trier of fact.
[6] "[W]here the parties place a construction upon the contract, the court will follow it." Merchants National Bank of Mobile v. Hubbard, 220 Ala. 372, 125 So. 335, 337 (1929).
[7] "[T]here is no surer way to find out what the parties meant than to see what they have done." Southern Bitulithic Co. v. Hughston, 177 Ala. 559, 566, 58 So. 450, 452 (1912) (quoting Brooklyn Life Ins. Co. v. Dutcher, 95 U.S. (5 Otto) 269, 273, 24 L.Ed. 410, 412 (1877)).
[8] "A witness, be he expert or lay, cannot give his opinion when such constitutes a legal conclusion or the application of a legal definition.... This rule is justified upon the ground that to allow such would be invading the province of the jury by giving an opinion upon an ultimate issue in the case." Charles W. Gamble, McElroy's Alabama Evidence § 128.07 (4th ed. 1991). (Emphasis added.)
[9] One can make a strong argument that Jason's contributory negligence is imputable to Christopher, regardless of whether this Court decides to hold Christopher to an adult standard of care. See § 491, Restatement (Second) of Torts (1965):

"Any one of several persons engaged in a joint enterprise ... is barred from recovering against ... other persons by the negligence of any member of the group."
See also McIsaac v. Monte Carlo Club, Inc, 587 So.2d 320, 326 (Ala.1991) (Houston, J., concurring in part and dissenting in part and arguing for the application of "the doctrine of complicity").